David Mara, Esq. (SBN 230498)
Jamie Serb, Esq. (SBN 289601)
Tony Roberts, Esq. (SBN 315595)
**MARA LAW FIRM, PC**
2650 Camino Del Rio North, Suite 205
San Diego, California 92108
Tel: (619) 234-2833; Fax: (619) 234-4048

Attorneys for Amanda Gonzalez and
Audriana Gonzalez

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA GONZALEZ and AUDRIANA GONZALEZ on behalf of themselves, all others similarly situated and on behalf of the general public,<br><br>        Plaintiffs,<br><br>v.<br><br>BURLINGTON COAT FACTORY WAREHOUSE CORPORATION and DOES 1-10,<br><br>        Defendants. | CASE NO. 5:18-cv-00666-JGB-SP<br><br>Honorable Jesus G. Bernal<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:      August 24, 2020<br>Time:     9:00 a.m.<br>Courtroom:  1<br><br>Filed:      February 27, 2018<br>FAC Filed: October 31, 2018<br>Trial Date: None |

Plaintiffs' Notice of Motion and Motion for
Preliminary Approval of Class Action
Settlement
       i       Case No. 5:18-CV-00666-JGB-SP

**TO THE HONORABLE JESUS G. BERNAL, ALL PARTIES, AND THEIR
COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs Amanda Gonzalez and Audriana
Gonzalez move this Court for an order: (1) Provisionally certifying the Class for
settlement purposes only; (2) Preliminarily approving the class action settlement
embodied in the Joint Stipulation of Class Action and PAGA Representative Action
Settlement and Release; (3) Approving the Class Notice and the plan for distribution
of the Notice; (4) Appointing the Settlement Administrator; and (5) Scheduling a Final
Approval Hearing.

This motion is set for determination on August 24, 2020, at 9:00 a.m. in
Courtroom No. 1 in the above entitled courthouse located at 3470 Twelfth Street,
Riverside, CA 92501. This motion is based upon this notice, the accompanying
Memorandum of Points & Authorities filed herewith, the accompanying Declaration
of David Mara, Esq., filed herewith, the Joint Stipulation and Settlement Agreement
and all exhibits thereto, the filings on record in this case, and upon such further
evidence, both documentary and oral, that may be presented at the hearing of this
motion.

Dated: July 27, 2020                 **MARA LAW FIRM, PC**

                                     By:/s/ David Mara
                                         David Mara, Esq.
                                         Jamie Serb, Esq.
                                         Tony Roberts, Esq.
                                         Attorneys for Plaintiffs

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................... 2

    A.     Investigation ............................................................................. 3

    B.     Settlement Negotiations ........................................................... 4

III.     SUMMARY OF SETTLEMENT ....................................................... 4

    A.     The Proposed Class .................................................................. 4

    B.     The Maximum Settlement Amount ........................................... 4

       i.     Class Representative Enhancement Payments ..................... 5

       ii.     Attorneys' Fees and Costs .................................................. 7

       iii.     Payment to the LWDA ....................................................... 8

       iv.     Settlement Administration Expenses ................................. 8

       v.     Settlement Payments to Class Members ............................. 9

    C.     Funding and Distribution of Settlement Funds ..................... 11

    D.     Uncashed Checks and Cy Pres Beneficiary ........................... 11

    E.     Released Claims ..................................................................... 12

IV.     CONDITIONAL CERTIFICATION SHOULD BE GRANTED .................. 13

    A.     The Rule 23(a) Class Requirements are Met ......................... 13

       i.     Numerosity ....................................................................... 13

       ii.     Commonality .................................................................... 13

       iii.     Typicality ......................................................................... 14

       iv.     The Class Representatives and Their Counsel are Adequate ............. 14

    B.     The Federal Rule of Civil Procedure 23(b) Standards are Satisfied ...... 15

       i.     Common Issues Predominate ............................................ 15

       ii.     The Class Action Device is Superior ................................ 16

       iii.     No Manageability or Ascertainability Issues Preclude Certification. 17

V.     PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS CLASS
COUNSEL ........................................................................................ 17

VI.     THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED .......... 18

A. Court Approval Under Rule 23(e) Should Be Granted.......................... 18

B. The Settlement Resulted from Arm's Length Negotiations ................. 19

C. The Balancing of Factors ..................................................................... 19

  i. Employer Status ................................................................... 20

  ii. Challenges to Certification.................................................. 21

  iii. Liability on the Merits......................................................... 22

    1. Plaintiffs' Claims for Unpaid Straight/Overtime Wages and Meal and Rest Periods Hinge on Whether Burlington Security Screenings Constitute a Sufficient Employer Control....................................... 22

      a. Wage Statement and Waiting Time Penalties Claims................ 25

      b. PAGA Claims ................................................ 25

D. Range of Exposure and Reasonable Discount ....................................... 26

VII. NATURE AND METHOD OF NOTICE ..................................................... 28

A. Data to Administrator and Notice Mailing ............................................ 28

B. The Notice Method Meets the Requirements of Rule 23 ..................... 29

VIII. CLASS ACTION FAIRNESS ACTION NOTICE........................................... 29

IX. CONCLUSION ............................................................................................ 30

**TABLE OF AUTHORITIES**

**Cases**

*Amaral v. Cintas Corp. No. 2*

(2008) 163 Cal.App.4th 1157, 1201 ....................................................... 25

*Amchem Prods., Inc. v. Windsor*, 5

21 U.S. 591, 620 (1997) ...................................................................... 16

*Augustus v. ABM Security Services, Inc.*,

2 Cal. 5th 257, 260, 265 (2017)............................................... 23, 24, 25

*Bell v. Farmers Ins. Exch.*,

11 Cal.App.4th 715, 725-26 (2004) ........................................................ 5

*Brinker Restaurant Corp. v. Superior Court*,

53 Cal.4th 1004 (2012).............................................. 16, 17, 23, 24

*Byrne v. Santa Barbara Hosp. Servs., Inc.*, No. EDCV17527JGBKKX,

2017 WL 5035366, at *9 (C.D. Cal. Oct. 30, 2017) ............................... 28

*Carrington v. Starbucks*,

30 Cal.App.5th 504, 517 (2018)............................................................. 27

*Ching v. Siemens Industry, Inc.*,

2013 U.S. Dist. LEXIS 169279 (N.D. Cal. 2013) ................................... 14

*Class Plaintiffs v. City of Seattle*,

955 F.2d 1268, 1276 (9th Cir. 1992)...................................................... 18

*Cook v. Niedert*, 1

42 F.3d 1004, 1015 (7th Cir. 1998)......................................................... 5

*Curry v. Equillon Enterprises, LLC*

(2018) 23 Cal.App.5th 289 ................................................................... 20

*Dilts v. Penske Logistics, LLC*,

267 F.R.D. 625 (S.D. Cal. 2010)........................................................... 14

*Doninger v. Pac. Nw. Bell, Inc.*,

564 F.2d 1304 (9th Cir. 1977 ............................................................... 13

*Dynamex Operations West, Inc. v. Superior Court*

(2018) 4 Cal.5th 903 ................................................................. 20

*Early v. Superior Court*,

79 Cal.App.4th 1420, 1433 (2000) ............................................ 6

*Frlekin v. Apple, Inc.*

8 Cal.5th 1038 (2020) ......................................................... 23, 24

*Gatreaux v. Pierce*,

690 F.2d 616 (7th Cir. 1982) ................................................... 18

*Gonzalez v. BMC W., LLC*, No. EDCV1700390JG BRAOX,

2018 WL 3830774, at *6 (C.D. Cal. May 23, 2018) ............... 28

*Grant v. Capital Mgmt. Servs., L.P.*,

2013 WL 6499698 (S.D. Cal. 2013) ........................................ 17

*Guippone v. BH S&B Holdings, LLC*,

2011 U.S., Dist. LEXIS 126026, *20 (S.D.N.Y. Oct. 28, 2011) ............................ 6

*Hamilton v. Wal-Mart Stores, Inc.* Case No. ED CV 17-01415-AB (KKx),

2019 U.S. Dist. LEXIS 153367 *1, *41 (C.D. Cal. March 4, 2019) ..................... 22

*Hanlon v. Chrysler Corp.*,

150 F. 3d 1011 (9th Cir. 1998) .......................................... 14, 17, 18, 19

*Henderson v. Equillon Enterprises, LLC*

(2019) 40 Cal.App.5th 1111 ................................................... 20

*In re Cellphone Fee Termination Cases*,

186 Cal.App.4th 1380, 1393 (2010) ......................................... 5

*In re Heritage Bond Litigation*,

2005 WL 1594403 (C.D. Cal. June 10, 2005) ......................... 18

*In re Hyundai & Kia Fuel Econ. Litig.*,

926 F.3d at 558 ...................................................................... 16

*In re Surebeam Corp. Secs. Litig.*,

2004 WL 5159061 (S.D. Cal. 2004) ....................................... 15

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,

   571 F.3d 953, 959 (9th Cir. 2009) ............................................................ 16

*Joel A. v. Giuliani*,

   218 F.3d 132 (2d Cir. 2000) .................................................................... 18

*Kaanaana v. Barrett Business Services, Inc.*,

   29 Cal.App.5th 778, 788 & 809 (2018) .................................................... 27

Koehl v. Verio, Inc.

   142 Cal.App.4th 1313, 1328 (2006) .......................................................... 6

*Lazarin v. Pro Unlimited, Inc.*,

   2013 WL 3541217 (N.D. Cal. 2013) ........................................................ 17

*Lewis v. Starbucks Corp.*, No. 2:07-cv-00490-MCE,

   2008 WL 4196690, at *6 (E.D. Cal. Sept. 11, 2008) ................................ 20

*Metrow v. Liberty Mut. Managed Care LLC*, No. EDCV1601133JGBKKX,

   2018 WL 6265083, at *4 (C.D. Cal. Jan. 9, 2018) ............................ 20, 28

*Nat'l Rural Telecommunication Cooperative v. Directv, Inc.*,

   221 F.R.D. 523 (C.D. Cal. 2004) ............................................................ 19

*Officers for Justice*,

   688 F.2d 615, 625 .................................................................................... 19

*Roberts v. Texaco*,

   979 F. Supp. 185 (S.D.N.Y. 1997) ............................................................ 5

*Rodriguez v. Hayes*,

   591 F.3d 1105 (9th Cir. 2010) ................................................................ 14

*Rodriguez v. West Publishing Corp.*,

   563 F.3d 948 (9th Cir. 2009) .................................................................. 19

*Romero v. Producers Dairy Foods*

   (E.D. Cal. 2006) 235 F.R.D. 474 ...................................................... 13, 16

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*

   (1989) 48 Cal.3d 341 ...................................................................... 20, 21, 28

*Staton v. Boeing*,

    327 F.3d 938, 977 (9th Cir. 2003) ............................................................ 5

*Telecomm. Corp. v. DirectTV*,

    221 F.R.D. 523, 527 (C.D. Cal. 2004) ...................................................... 28

*Thornton v. East Texas Motor Freight*, 4

    97 F.2d 416, 420 (6th Cir. 1974) ............................................................. 5

*Thurman v. Bayshore Transit Management, Inc.*

    (2012) 203 Cal. App. 4th 1112, 1135-1136 ............................................ 26

*Troester v. Starbucks Corp.*,

    5 Cal.5th 829 (2019) ........................................................................... 24, 25

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co.*,

    593 F.3d 802 (9th Cir. 2010) ................................................................... 13

*Vanwagoner v. Siemens Industry, Inc.*,

    2014 U.S. Dist. LEXIS 67141 (N.D. Cal. 2014) ..................................... 14

Whiteway v. Fedex Kinkos Office & Print Services, Inc.,

    2007 U.S. Dist. LEXIS 95398 (N.D. Cal. 2007) ....................................... 7

**Statutes**

California Code of Regulaiton Title 8 § 13520 ........................................ 25

California Civil Code § 1542 ................................................................... 18

California Labor Code § 203(a) ............................................................... 25

California Labor Code § 218.5 ................................................................... 6

California Labor Code § 226.7 ................................................................. 24

Federal Rule of Civil. Procedure, Rule 23 (a) .................................. 13, 14

Federal Rule of Civil. Procedure, Rule 23 (a)(1) .................................... 13

Federal Rule of Civil. Procedure, Rule 23 (a)(3) .................................... 14

Federal Rule of Civil. Procedure, Rule 23 (a)(4) .................................... 14

Federal Rule of Civil. Procedure, Rule 23 (b) ........................................ 13

Federal Rule of Civil. Procedure, Rule 23 (b)(3) .......................... 13, 15, 16

Federal Rule of Civil. Procedure, Rule 23 (c)(2) ........................................................ 29

Federal Rule of Civil. Procedure, Rule 23 (c)(3) ........................................................ 29

Federal Rule of Civil. Procedure, Rule 23 (e) ............................................................ 18

Federal Rule of Civil. Procedure, Rule 23 (g) ............................................................ 17

**Other Authorities**

Back Track Screening, http://www.btscreening.com/wp-content/uploads/2012/09/
    Screening-101.pdf. ................................................................................................ 6

*Manual for Complex Litigation*, Fourth, § 22.661 (2004)........................................ 18

*Newberg on Class Actions* §8.32 at 8-103 ................................................................ 29

PreciseHire, https://precisehireblog. wordpress.com/2013/11/21/pre-employment-
    background-checks-have-become-a-busines-necissity/. ......................................... 6

Reliable Plant, www.reliableplant.com/Read/6959/a-solution-to-fear-of-hiring-
    litigious-employees ................................................................................................ 6

# I.   INTRODUCTION

Amanda Gonzalez and Audriana Gonzalez ("Plaintiffs") are former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions[1]   and worked at Burlington Coat Factory Warehouse Corporation's ("Burlington" or "Defendant") distribution centers located in California. In this wage and hour matter, Plaintiffs allege wage and hour violations against Burlington.

Plaintiffs seek preliminary approval of the Parties' Joint Stipulation of Class Action and PAGA Representative Action Settlement and Release ("Joint Stipulation"). The proposed Maximum Settlement Amount ("MSA") is a non-reversionary $3,000,000. The settlement, sought on behalf of approximately 5,776  class members,[2] involves a proposed Class defined as: "All current and/or former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California at any time between February 27, 2014 and [August 22, 2020 or the Date of Preliminary Approval of this settlement, inclusive, whichever is earliest]." Participating Class Members[3] shall automatically receive their share of the Settlement without needing to submit a claim form. The settlement is projected to pay each Class Member an average of $319.11,[4] less applicable taxes for the wages portion of the settlement share.

The Parties reached the proposed settlement after considerable investigation as well as the analysis of hundreds of pages of documents and hundreds of thousands of

---

[1] "Lyneer Staffing Solutions" means Lyneer Staffing Solutions, Infinity Staffing Solutions, LLC dba Lyneer Staffing Solutions, Staff4Jobs, LLC dba Lyneer Staffing Solutions, Employers HR LLC, Ciera Staffing, LLC, Lyneer Staffing Solutions, LLC, and all of their members, predecessors, successors, affiliates, and related companies, including but not limited to, Gary Spinner, Todd McNulty, James Radvany, Bryan Smith, Brian Henderson, Marti White and Greg Lomonaco.
[2] At the parties' mediation, there were an estimated 5,670 class members who collectively worked a total of 1,078,255 hours, or an average of 190 hours each. Data from Lyneer Staffing Solutions current through June 2020 shows that there are now 5,776 class members.
[3] "Participating Class Members" are Class Members who do not opt-out of the Settlement or who opt-out but subsequently rescinds the opt-out in a timely manner. See Declaration of David Mara, Esq. ("Mara Decl."), Ex. 1 at ¶ 34.
[4] $1,843,194.68 divided by 5,776 Class Members equates to $319.11 per Class Member.

lines of data, including pay and time records. The settlement reflects the relative strengths of Plaintiffs' case and the risks associated with continued litigation such as Burlington prevailing on its defenses, and the risks of maintaining class certification. When accounting for the risks, the proposed settlement is in the best interests of the Class. Plaintiffs therefore respectfully request that the Court preliminarily approve the settlement, approve the notice of settlement, appoint CPT Group, Inc. as the Settlement Administrator, appoint Amanda Gonzalez and Audriana Gonzalez as the class representatives, appoint Plaintiffs' Counsel as Class Counsel, and schedule a final approval hearing.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Burlington is an off-price retailer with operations in California.  The company ships products from distribution centers in San Bernardino and Redlands as part of its supply chain operation. Burlington utilizes temporary workers from Lyneer Staffing Solutions at its distribution centers to assist with the flow of merchandise during the distribution process. This class settlement involves non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California. *See* Mara Decl. at ¶ 24**.**

Plaintiffs filed their Complaint on February 27, 2018. See Dkt. No. 1. On March 29, 2018, Burlington filed an Answer and later removed this matter on April 2, 2018. *Id.*

On October 1, 2018, Plaintiffs filed their First Amended Complaint, which Burlington answered on October 31, 2018. *See* Dkt. No.'s 17, 20. Plaintiffs allege that as a result of uncompensated time spent in security lines/bag checks, among other things, they and the putative class were not paid all wages due, including all overtime hours at the applicable premium rates of pay, all applicable minimum wages, and compensation for all hours worked, were not provided meal period and rest breaks or paid additional sums of money in lieu thereof, were not furnished accurate paystubs, were not paid all wages due at termination of employment, and they allege that these practices violated California's Unfair Competition Law. *Id.* Plaintiffs also allege claims for Burlington's

failure to provide recovery periods and failure to produce personnel records and failure to produce wage records. *Id.*

As part of the Parties' settlement, Plaintiffs wish to file a Second Amended Complaint adding PAGA claims into their wage and hour class action. Plaintiffs' proposed Second Amended Complaint ("SAC") is attached to the Joint Stipulation as Exhibit B. As part of this motion, Plaintiffs respectfully request that the Court grant Plaintiffs leave to file their SAC. Mara Decl. ¶ 25.

Plaintiffs' SAC defines the putative class as: "All current and/or former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California at any time during the period of the relevant statute of limitations." *Id.* at ¶ 54. As such, the class defined in the SAC matches the class in the proposed settlement.[5]

**A. Investigation**

Throughout the course of litigation, the Parties engaged in concentrated informal discovery. Although informal in the sense that documents, data, and information were produced pursuant to informal requests instead of formal discovery inquiries, the gathering of information was no less robust than Plaintiffs would obtain through formal means. Mara Decl. ¶ 26.

The discovery conducted and the resultant meet and confer efforts led to exchanging hundreds of pages of documents and hundreds of thousands of lines of data. The information and data included, for example, policies and best practices, meal period and rest break policies, contracts between Burlington and Lyneer Staffing Solutions, Lyneer Staffing Solutions' time records, attendance records, and pay records, as well as personnel files. Plaintiffs hired an expert, Mr. Jarrett Gorlick, who analyzed the timekeeping and payroll data. Mara Decl. ¶ 27.

---

[5] The proposed Class in the Parties' Joint Stipulation is defined as "All current and/or former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California at any time between February 27, 2014 and [August 22, 2020, or the Date of Preliminary Approval of this settlement, inclusive, whichever is earliest.]"

**B. Settlement Negotiations**

On January 3, 2019, the Parties attended mediation with Jeff Ross. At the first mediation, the Parties found unintended flaws in the data—*i.e.*, the number of shifts used in the Parties exposure analysis was inflated for many temporary workers. As such, the Parties agreed to reschedule the mediation.  Mara Decl. ¶ 28.

On October 15, 2019, the Parties attended a second mediation with David Rotman. Mara Decl. ¶ 29. The mediation resulted in a mediator's proposal later accepted by both Parties. *Id.* The Parties' memorialized the settlement in a long form agreement and now seek the Court's approval of their Joint Stipulation, which is attached to the Declaration of David Mara, Esq., in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement as Exhibit 1.

### III.    SUMMARY OF SETTLEMENT

The principal terms of the Joint Stipulation are as follows:[6]

### A. The Proposed Class

The Joint Stipulation proposes a Class comprised of: All current and/or former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California at any time between February 27, 2014 and [August 22, 2020 or the Date of Preliminary Approval of this settlement, inclusive, whichever is earliest]. *See* Mara Decl., Ex. 1 at ¶¶ 3, 6. There are approximately 5,776 individuals who fall within this Class definition. See Mara Decl. at ¶ 30.

### B. The Maximum Settlement Amount

Under the Joint Stipulation, Burlington shall pay $3,000,000 ("Maximum Settlement Amount or "MSA")—that is, the total amount Burlington is required to pay under the Joint Stipulation. ***No portion of the MSA will revert to Burlington for any reason.*** The following deductions from the MSA will be made, subject to the Court's approval:

---

[6] The terms of the settlement are set forth in the Joint Stipulation attached as Exhibit 1 to the Declaration of David Mara, Esq., in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Mara Decl.").

### i. Class Representative Enhancement Payments

Subject to the Court's approval, Plaintiffs shall receive a payment not to exceed $7,500 each. The payment shall be made from the MSA. If the amount awarded is less than the amount requested, the difference shall become part of the Net Settlement Amount ("NSA"). Mara Decl. ¶ 31.

Courts routinely approve service payments, or incentive awards, to compensate a named plaintiff for the services he or she provides and the risks he or she incurs during class litigation. *See In re Cellphone Fee Termination Cases*, 186 Cal.App.4th 1380, 1393 (2010); *see also Bell v. Farmers Ins. Exch.*, 11 Cal.App.4th 715, 725-26 (2004) (upholding services payments to class representatives). Courts have regularly and routinely granted approval of settlements containing such enhancements.[7] In Class Counsel's experience, the typical enhancement award in wage and hour class action settlements ranges from $5,000 to $75,000. Very commonly there is more than one class representative who receives an award in the above range. Mara Decl. ¶ 31.

The requested enhancement of $7,500 is appropriate and reasonable and unopposed by Burlington. This payment is made, in part, to compensate Plaintiffs for the work they performed on this case. As part of final approval, Plaintiffs will submit a declaration detailing the efforts they expended on behalf of the Class to advance this case to its successful conclusion. There is no question that this case would not have reached the same result but for Plaintiffs' involvement and input at all stages of the litigation. Mara Decl. ¶ 31.

The requested service awards are also reasonable considering the reputational risks that Plaintiffs assumed in bringing this action against Burlington. Plaintiffs put their future employment prospects at risk by becoming class representatives, as the fact

---

[7] *See, e.g., Staton v. Boeing*, 327 F.3d 938, 977 (9th Cir. 2003); *accord Cook v. Niedert*, 142 F.3d 1004, 1015 (7th Cir. 1998); *Roberts v. Texaco*, 979 F. Supp. 185 (S.D.N.Y. 1997) ("present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril, a substantial enhancement award is justified"); *Thornton v. East Texas Motor Freight*, 497 F.2d 416, 420 (6th Cir. 1974) ("We also think there is something to be said for rewarding those drivers who protect and help to bring rights to a group of employees who have been the victims of discrimination.").

that they filed a lawsuit "is searchable on the internet and may become known to prospective employers when evaluating" their future employment. *Guippone v. BH S&B Holdings, LLC*, 2011 U.S., Dist. LEXIS 126026, *20 (S.D.N.Y. Oct. 28, 2011). Employers routinely screen employee candidates to determine whether they have ever filed a suit against other employers, allowing them to screen out the litigious candidates. An entire industry exists that allows employers to run extensive background searches on potential employees. Companies who provide these services specifically highlight the fact that their services allow employers to weed out litigious employment candidates. Reliable Plant outlines ways that employers can "get a sense of whether a prospective employee is likely to sue" the employer, through background checks and other means, to screen out these employees.[8] Onicra Credit Rating Agency of India states: "Background screening has become a necessity in today's litigious society." Back Track Screening also represents: "In today's litigious culture, employers simply cannot afford to hire employees who will put their company at risk."[9] PreciseHire also offers employment screening and similarly warns: "with today's business climate being extremely competitive and highly litigious, conducting pre-employment background checks has become a necessity."[10]

    As representatives for the absent class members, Plaintiffs also risked a potential judgment taken against them for attorneys' fees and costs if this matter had not been successfully concluded. Courts affirm that a losing party is liable for the prevailing party's costs, *Early v. Superior Court*, 79 Cal.App.4th 1420, 1433 (2000), and in some wage and hour actions, such as this case, pursuant to California Labor Code § 218.5, for attorneys' fees as well. Unfortunately, courts have entered several judgments against class representatives. *See e.g. Koehl v. Verio, Inc.* 142 Cal.App.4th 1313, 1328 (2006) (a wage and hour class action where Defendant prevailed at trial, the named Plaintiffs

---

[8] *See* Reliable Plant, www.reliableplant.com/Read/6959/a-solution-to-fear-of-hiring-litigious-employees.
[9] *See* Back Track Screening, http://www.btscreening.com/wp-content/uploads/2012/09/Screening-101.pdf.
[10] *See* PreciseHire, https://precisehireblog. wordpress.com/2013/11/21/pre-employment-background-checks-have-become-a-busines-necissity/.

were held liable, jointly and severally for the Defendant's attorneys' fees, in an amount exceeding $500,000); *Whiteway v. Fedex Kinkos Office & Print Services, Inc.,* 2007 U.S. Dist. LEXIS 95398 (N.D. Cal. 2007) (a wage and hour misclassification case lost on summary judgment, after the case was certified, the court assessed costs against the named Plaintiff in the sum of $56,788). The risk of payment of Burlington's costs, alone, is a sufficient basis for an award of the requested enhancement sum. Few individuals are willing to take this risk, and the appointed Class Representatives here championed a cause on behalf of others with potentially huge monetary risks.

The enhancement request is modest for the work performed, risks undertaken for payment of fees and costs if this case had not been successfully concluded, stigma on future employment opportunities, and the benefits all class members will enjoy as a result of Plaintiffs' efforts. Thus, the Court should preliminarily approve the request.

### ii. Attorneys' Fees and Costs

Subject to Court approval, Plaintiffs' Counsel shall request an award of attorneys' fees in an amount of $750,000 (25% of the MSA). This includes work remaining in documenting the settlement, securing Court approval, ensuring the settlement is fairly administered, and obtaining dismissal of the action. Also, subject to Court approval, Plaintiffs' Counsel shall request a reimbursement from the MSA for actual litigation costs in an amount not to exceed $50,000.[11] Class Counsel will move the Court for a fee award in conjunction with final approval. Class Counsel will file the moving papers in support of their attorney fee request no later than fourteen (14) days before the expiration of the notice period. At that time, Class Counsel intends on requesting 25% of the MSA as their fee award, which is in line with the federal benchmark for such awards. Class Counsel will submit a fee motion, supporting their request for 25% of the MSA—which is $750,000—including a lodestar crosscheck, hours, and hourly rates. Mara Decl. ¶ 32.

---

[11] *See* Mara Decl., Ex. 1 at ¶¶ 54(e)(i) & (vi). Plaintiffs will only seek the amount of actual costs incurred during the litigation of this case. Should the actual costs exceed $50,000, Plaintiffs will only seek reimbursement of costs up to $50,000. If the actual costs are less than the $50,000 cap, the remainder will become part of the NSA, distributable to Participating Class Members. Mara Decl. ¶ 33.

### iii.  Payment to the LWDA

Subject to Court approval, the Joint Stipulation allocates $300,000 of the MSA to PAGA penalties ("PAGA Payment"). Seventy-five percent (75%) ($225,000) of the PAGA Payment shall be paid to the LWDA, and twenty-five percent (25%) ($75,000) of the PAGA Payment will become part of the NSA distributed to PAGA Group Members. *See* Mara Decl., Ex. 1 at ¶¶ 31-32, 54(e)(iii)-(iv).

### iv.  Settlement Administration Expenses

The Parties respectfully request to appoint CPT Group, Inc. ("CPT") as the settlement administrator. CPT, an experienced class administration company, has acted as claims administrator in numerous wage and hour cases. The Joint Stipulation allocates $45,000[12] to administer this settlement, which falls within the range of estimates Class Counsel has received in the past for settlements of similar size and circumstances. Mara Decl. ¶ 34. CPT has provided an estimate that its expenses will be approximately $45,000. *See* Mara Decl., Ex. 2 (CPT Group, Inc. Bid).

These costs are reasonable as CPT will mail notice packets to Class Members and keep track of requests for exclusion from the settlement. CPT will also maintain a website which has information about the settlement and links to the settlement documents. After CPT receives the Class Data,[13] CPT will update the addresses for the Class Members/PAGA Group Members using the National Change of Address database and other available resources. Any returned envelopes from the initial mailing with forwarding addresses will be used by CPT to locate Class Members/PAGA Group Members and re-mail the Class Notice to the correct or updated address. CPT will use all appropriate tracing methods, including skip tracing, to ensure that the Class Notices are received by Class Members/PAGA Group Members. And, CPT will take all

---

[12] *See* Mara Decl. Ex. 1 at ¶¶ 41, 54(v). If the final cost of administration is less than the $45,000 cap, the remainder will become part of the NSA, distributable to Participating Class Members.
[13] The "Class Data" is the electronic database Burlington shall obtain from Lyneer Staffing Solutions and deliver to the Settlement Administrator including the name(s), last known residence addresses, Social Security numbers, and dates worked as Class Members/PAGA Group Members during the Class Period/PAGA Period. *See* Mara Decl., Ex. 1 at ¶ 65.

reasonable steps, including tracing, to deliver notices returned as undeliverable. Mara Decl., Ex. 1 at ¶¶ 67, 68.

Should the Court approve the settlement, CPT will work with Burlington to facilitate funding the MSA, disbursing the Court approved payments, and disbursing the NSA to Participating Class Members. *See* Mara Decl., Ex. 1 at ¶¶ 56-78.

The Settlement Administration Costs will be paid out of the MSA. If CPT's actual expenses or the amount awarded is less than the amount allotted in the Joint Stipulation, the difference shall become part of the NSA and be available for distribution to Participating Class Members.

In addition, the employer's payroll tax obligations were priced into, and will be satisfied from, the MSA.

### v. Settlement Payments to Class Members

After all deductions and employer payroll tax obligations have been made, it is estimated that $1,843,194.684 ("Net Settlement Amount" or "NSA"),[14] less withholdings for federal and state taxes on the amounts deemed wages, will be available for disbursement to Participating Class Members--$75,000 in PAGA penalties and $1,768,194.68 in wages, interest, and penalties, resulting in an average payment of $319.11[15] per Class Member. Per the Agreement, the term "Participating Class Members" is defined as any Class Member who does not opt-out of the Settlement or who opts-out but subsequently rescinds the opt-out in a timely manner. The money available for payout to these individuals comes out of the NSA, which is what remains of the MSA after subtracting all Court approved attorneys' fees and costs, the Class Representative Enhancement Payment, settlement administration costs, the LWDA's

---

[14] $3,000,000 MSA - $45,000 (administration costs) - $50,000 (costs) - $750,000 (attorneys' fees) - $15,000 (service awards) - $225,000 (LWDA share of PAGA penalties) = $1,915,000 after deductions. Of the $1,915,000, one-third, or $638,296.50 is attributable to wages. This amount is multiplied by 11.25% to arrive at the estimated employer payroll taxes of $71,805.32. Subtracting $71,805.32 in payroll taxes from $1,915,000 results in the $1,843,194.68 NSA. Mara Decl. ¶ 34.
[15] $1,843,194.68 divided by 5,776 Class Members equates to $319.11 per Class Member. Mara Decl. ¶ 34.

portion of the PAGA Payment, and the employer's payroll tax obligation. Mara Decl. ¶ 34.

Each Individual Settlement Payment will be calculated as follows:

The Settlement Administrator shall … pay each Participating Class Member a pro rata portion of the Net Settlement Amount based on the number of weeks he or she worked as a Class Member. That pro rata portion shall be determined by dividing the total number of weeks worked as a Class Member by all members of the Class into the amount of the Net Settlement Amount to arrive at an amount per week; then, for each eligible Class Member, multiplying that amount times the number of weeks the Settlement Administrator determines that such individual was working as a Class Member.[16]

Accordingly, each Class Member's settlement share ties directly to the number of weeks that Class Member worked at a Burlington distribution center during the relevant time period.

One-Third (1/3) of each Settlement Payment is intended to settle each Class Member's claims for alleged unpaid wages. This wage portion will be reduced by applicable payroll tax withholdings. The Settlement Administrator will issue an IRS Form W-2 to each Participating Class Member with respect to the wage portion of his/her Settlement Payment. *See* Mara Decl., Ex. 1 at ¶ 61.

Two-Thirds (2/3) of the Settlement Payment is intended to settle each Class Member's claims for interest and penalties. This non-wage portion will not be reduced by payroll tax withholding and deductions. The Settlement Administrator will issue to each Participating Class Member an IRS Form 1099 with respect to this non-wage portion of his/her Settlement Payment. All PAGA Group Payments will be allocated entirely to penalties and reported on IRS 1099 Forms. *See* Mara Decl., Ex. 1 at ¶ 61.

---

[16] *See* Mara Decl., Ex. 1 at ¶ 54(ix). The Settlement Administrator will also conduct a similar pro rata calculation for each PAGA Group Member to determine their share of the PAGA Group Payment and pay those amounts in a separate check to all PAGA Group Members. Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked divided by (ii) the total number of weeks worked by all Participating Class Members based on the same Class Data, which is then multiplied by the Net Settlement Amount. One day worked in a given week will be credited as a work week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the amount of weeks that he or she worked. *See* Mara Decl., Ex. 1 at ¶ 54(x).

## C. Funding and Distribution of Settlement Funds

Subject to the Court's final approval and provided there are no objections or appeals to the Court's final approval order and judgment, the MSA shall be funded by Burlington within 10 days after the Settlement Effective Date.[17]

## D. Uncashed Checks and Cy Pres Beneficiary

Pursuant to the Joint Stipulation, any checks issued to Participating Class Members shall remain valid and negotiable for 180 days from the date of issuance. The Parties agreed that the funds from any uncashed checks will be sent to a cy pres beneficiary. Mara Decl., Ex. 1 at ¶¶ 11, 78, 95. If any checks remain uncashed or not deposited by the expiration of the 90-day period after mailing the reminder notice, the Settlement Administrator will mail a reminder notice to these individuals. *Id.* The Settlement Administrator will deposit with the Cy Pres Beneficiary any funds that were allocated to Participating Class Members who did not cash their settlement check within 180 days of mailing. *Id.*

The Parties chose the United Way of California as the cy pres beneficiary.[18] The United Way of California is an umbrella organization, supporting multiple local United Ways throughout the state that all serve the public by working towards financial stability of the citizens they support. The United Way has specific programs aimed at promoting steady, gainful employment of Californians, something that meets the objectives of a lawsuit brought with the aim of enforcing employee rights, and supports silent class

---

[17] *See* Mara Decl., Ex. 1 at ¶¶ 43, 95. "Settlement Effective Date" means thirty (30) calendar days after entry of the Final Approval Order. If an appeal or motion to intervene is filed, then "Settlement Effective Date" means the date of final resolution of any appeal from the Final Approval Order where the resolution affirms the Final Approval Order. The Settlement Effective Date cannot occur, and Defendant will not be obligated to fund this Settlement, unless and until there is no possibility of an appeal or further appeal (by anyone who has the right to, or claims to have the ability to, take an appeal) that could potentially prevent this Settlement Agreement from becoming final and binding. The Parties intend that the Final Approval Order will effectuate the releases and extinguish all released claims, including but not limited to PAGA claims, for the periods covered by this Settlement on the Settlement Effective Date. The Court will retain jurisdiction to enforce the Settlement after the Settlement Effective Date.
[18] There is no relationship between the proposed cy pres beneficiary and the Parties or their Counsel.

members through the variety of programs offered. For example, the United Way institutes local programs offering job coaching and training, career development, and business development, providing the skills needed to find and maintain a lifelong career. Beyond just programs supporting job seekers and employees, the United Way also advocates at the policy level for an increase to the State minimum wage. *See* Mara Decl. ¶ 37.

### E. Released Claims

In exchange for Burlington's promise to make the payments provided for in the Joint Stipulation, "[t]he releases agreed upon and made part of the settlement by Participating Class Members ("Settlement Class Released Claims") shall include a release of Releasees[19] … of the Settlement Class Released Claims. Settlement Class Released Claims are any and all wage and hour claims that accrued during or prior to the Class Period and that were or could have been asserted in the instant Action based on the allegations in any pleading in the Action, including the Second Amended Complaint, whether such claims were asserted or not, including but not limited to any and all claims for straight time, overtime, minimum wage, meal and rest breaks, recovery periods, wage statements, waiting time penalties, unfair competition, failure to produce personnel or wage records, and claims under the California Labor Code Private Attorneys General Act, Labor Code §§ 2699, *et seq.* ("PAGA"), as well as any and all state or federal claims that are derivative or directly related to the foregoing claims, including any claims for wages, penalties, premium pay, punitive damages, and interest, and/or under the common law, such as conversion and unjust enrichment, and any claims under the California Business & Professions Code. All Participating Class Members shall be bound by the release unless they formally opt-out. The PAGA Group shall be

---

[19] "Releasees" means each and all of Burlington Coat Factory Warehouse Corporation, Lyneer Staffing Solutions (as defined above), and each of their respective predecessors, successors and assigns, their current and former direct and indirect parents, affiliates, subsidiaries, divisions, and related business entities, and their current and former officers, directors, shareholders, employees, agents, representatives and employee benefit programs (including the trustees, administrators, fiduciaries and insurers of such programs). *See* Mara Decl., Ex. 1 at ¶ 37.

bound by the release as to any PAGA claims even if they have formally opted-out of the Class." *See* Mara Decl., Ex. 1 at ¶ 85. The release covers facts that were alleged or could have been alleged in Plaintiffs' complaint and PAGA letter, as such the release is tied to the facts contained therein. Only the named Plaintiffs have agreed to a general release of all claims, including a waiver under California Civil Code section 1542.

## IV.    CONDITIONAL CERTIFICATION SHOULD BE GRANTED

A class action may be certified if all four prerequisites under Federal Rule of Civil Procedure 23(a) are satisfied and at least one subsection under Rule 23(b) is met. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304 (9th Cir. 1977). The Rule 23(a) requirements are known as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010). These requirements are met here. In addition, the Parties agreed to certification of the Class under Rule 23(b)(3) which includes the "predominance" requirement. *Id.* Burlington does not oppose conditional certification for the purpose of settlement only. As such, the Parties seek provisional certification of the Class. Should the settlement not be approved or not become final for any reason, the Parties agree no class will be certified, and Burlington's agreement to certify a class conditionally for settlement purposes only will not be used in connection with any subsequent motion for class certification.

### A. The Rule 23(a) Class Requirements are Met
#### i.  Numerosity

Impracticality of joinder is the hallmark of the numerosity analysis. *See* Fed. R. Civ. P. 23(a)(1). "The numerosity requirement is more readily met when a class contains employees suing their present employer . . . This is because class members may be unwilling to sue their employer individually out of fear of retaliation." *Romero v. Producers Dairy Foods*, 235 F.R.D. 474, 485 (E.D. Cal. 2006). Here, joinder of approximately 5,776 proposed class members is impractical. Hence, the class is numerous, and a classwide proceeding is preferable.

#### ii.  Commonality

Rule 23 (a) requires common questions of law or fact to the class. However, "all questions of fact and law need not be common to satisfy the rule…[and] [t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1019 (9th Cir. 1998). Here, common questions exist, such as whether Burlington is a joint employer, and whether Burlington's uniform policies deprived the Class of wages and legally compliant meal periods and rest breaks. Courts in the Ninth Circuit have found this sufficient to show commonality.[20]

### iii.  Typicality

Typicality screens out class representatives with factual circumstances markedly different than fellow class members, thereby ensuring adequate representation centrally focused on common issues. *See* Fed. R. Civ. P. 23(a)(3). This requirement is "permissive" and requires only that the representative's claims be reasonably related to those of the absent class members. *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). Plaintiffs' claims and the Class Members' claims are based on the same alleged course of conduct, *e.g.*, the claim that Burlington does not pay all wages owed or provide compliant meal periods and rest periods due to the same security procedure implemented by Burlington and experienced by all temporary workers. Plaintiffs and the Class also suffer similar injuries, *e.g.*, the non-payment of premiums for allegedly unprovided meal periods and rest breaks, and unpaid wages.

### iv.  The Class Representatives and Their Counsel are Adequate

Adequacy requires absence of conflicts and assurances of vigorous prosecution. The proposed Class Representatives and their counsel have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement has two prongs, the first being "that the representative party's attorney be qualified, experienced, and generally able to conduct the litigation." *In re Surebeam*

---

[20] *See Dilts v. Penske Logistics, LLC,* 267 F.R.D. 625, 633 (S.D. Cal. 2010); *Ching v. Siemens Industry, Inc.*, 2013 U.S. Dist. LEXIS 169279, *4 (N.D. Cal. 2013); *Vanwagoner v. Siemens Industry, Inc.*, 2014 U.S. Dist. LEXIS 67141, *11 (N.D. Cal. 2014).

*Corp. Secs. Litig.*, 2004 WL 5159061, *5 (S.D. Cal. 2004). In this case, Plaintiffs' Counsel, David Mara, Jamie Serb, and Tony Roberts of Mara Law Firm, PC, meet this standard and have been appointed class counsel in numerous class actions. *See* Mara Decl. ¶¶ 2-8, 16-17, 20).

The second prong of the adequacy test is "that the suit not be collusive and plaintiff's interests not be antagonistic to those of the remainder of the class." *In re Surebeam Corp. Secs. Litig.*, 2004 WL 5159061, *1-2 (S.D. Cal. 2004). Here, there is no evidence of antagonism between the Class Representatives' interests and those of the Class. The Class Representatives have litigated this case in good faith and the interests of the Class Representative are aligned with those of the Class as they all share a common interest in challenging the legality of the alleged policies and procedures on which the claims are based. There is also no evidence of any collusion between the Parties. Plaintiffs' and Burlington agreed to a $3,000,000 settlement sum, based on a mediator's proposal, after extensive exchange and analysis of information and data, expert analysis, as well as two mediations with experienced and neutral mediators. As such, Plaintiffs should be appointed as Class Representatives. At the Final Approval Hearing, Class Counsel will request final approval of Class Representative Enhancement Payments to compensate Plaintiffs for their efforts in prosecuting this matter and for the risks and stigma they now face for doing so.

### B. The Federal Rule of Civil Procedure 23(b) Standards are Satisfied
#### i. Common Issues Predominate

Additionally, a court must find that common issues of law or fact "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). With regard to the requirements of subsection (b), Rule 23(b)(3) allows class certification where common questions of law and fact predominate over individual questions and class treatment is superior to individual litigation.

Normally, the predominance inquiry calls on the court to pragmatically assess the entire action and the issues involved to determine if the common questions present a significant aspect of the case and can be resolved for all members of the class in a single

adjudication. *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 489 (E.D. Cal. 2006). In the settlement context, by contrast, a court's evaluation of Rule 23's predominance and manageability standards are relaxed. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 558 ("[W]hether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement. A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable.").

"The main concern in the predominance inquiry … [is] the balance between individual and common issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009). In the context of a settlement-only class, "a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

For the purposes of settlement, the proposed settlement Class is sufficiently cohesive to warrant adjudication by representation. Plaintiffs contend they base all claims on allegedly common, classwide policies and procedures, and that liability can be determined on a classwide basis. *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1033 (2012). As noted above, the major issues of whether Burlington provided timely and duty-free meal and rest periods, and paid all wages owed to Plaintiffs and the Class stem from uniform policies and practices experienced by all temporary workers subjected to Burlington's security procedures.

## ii.  The Class Action Device is Superior

The class action device is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Certification of the Class will allow class members' claims to be fairly, adequately, and efficiently resolved to a degree that no other mechanism would provide. Alternative methods of resolution would include individual claims for relatively small amount of damages. *Hanlon*, 150

F. 3d at 1019-20. These claims "would prove uneconomic for potential plaintiffs' because 'litigation costs would dwarf potential recovery.'" *Id.* at 1023.

### iii. No Manageability or Ascertainability Issues Preclude Certification

Finally, no issues of manageability or ascertainability preclude certification. A court faced with a request for a settlement-only class need not inquire whether the case would present intractable problems of trial management, even though other requirements under Rule 23 must still be satisfied. *See, e.g.*, *Lazarin v. Pro Unlimited, Inc.*, 2013 WL 3541217, *5 (N.D. Cal. 2013). The proposed plan of distribution and settlement process, as discussed herein, are efficient and manageable. Also, it is administratively feasible for the court to determine whether an individual is a class member as the settlement class is easily verifiable through Lyneer Staffing Solutions' records and/or Burlington's records which will be provided by Burlington to the Settlement Administrator. *See* Mara Decl., Ex. 1 at ¶¶ 54(e)(xi), 65.

### V. PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

Rule 23(g) codifies four factors to consider when appointing settlement class counsel: (1) whether counsel has investigated the class claims; (2) whether counsel is experienced in handling class actions and complex litigation; (3) whether counsel is knowledgeable regarding the applicable law; and (4) whether counsel will commit adequate resources to representing the class. *See Grant v. Capital Mgmt. Servs., L.P.*, 2013 WL 6499698, *2-3 (S.D. Cal. 2013). Plaintiffs' Counsel should be appointed Class Counsel as Plaintiffs' Counsel is highly experienced and knowledgeable regarding complex wage and hour class actions like this one. *See* Mara Decl. ¶¶ 3-21, 38. Indeed, Plaintiffs' counsel was class counsel in *Hohnbaum et al. v. Brinker Restaurant Corp et al.*, which is the subject case in the landmark decision of *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012). Mara Decl. at ¶ 4. By prosecuting numerous cases on behalf of employees for California Labor Code violations, Plaintiffs' Counsel has merited the experience and qualification to evaluate the class claims, to evaluate settlement versus trial on a fully informed basis, and to evaluate the viability of

Burlington's defenses. Mara Decl. ¶¶ 3-21, 38.   In sum, Plaintiffs' Counsel fully commits to representing the Class in this case, have the skill and expertise to do it properly, and will continue to do so whether or not the settlement is approved. Accordingly, appointing David Mara, Jamie Serb, and Tony Roberts of Mara Law Firm, PC as Class Counsel is appropriate.

## VI.    THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED
### A. Court Approval Under Rule 23(e) Should Be Granted

Rule 23(e) provides that any compromise of a class action must receive court approval. The court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon*, 150 F.3d at 1026. In deciding whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 WL 1594403 (C.D. Cal. 2005). Court approval involves a two-step process in which a court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted. *Manual of Complex Litigation*, Fourth Ed., § 21,632 (2004). At the preliminary approval stage, the Court need only "determine whether the proposed settlement is within the range of possible approval." *Gatreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). A class action settlement should be approved if "it is fundamentally fair, adequate and reasonable." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

Although at preliminary approval, the Court need not engage in the rigorous analysis required for final approval (*see Manual for Complex Litigation*, Fourth, § 22.661 at 438 (2004)), the ultimate fairness determination will include balancing several factors, including:

> [T]he strength of plaintiffs' case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the Class Members to the proposed settlement.

1    *Officers for Justice*, 688 F.2d 615, 625. Not all these factors apply to every class

2    action settlement, and one factor alone may prove determinative in finding sufficient

3    grounds for court approval. *Nat'l Rural Telecommunication Cooperative v. Directv,*

4    *Inc.*, 221 F.R.D. 523, 525-26 (C.D. Cal. 2004). District courts have wide discretion in

5    assessing the weight and applicability of each factor. *Id.*

### B. The Settlement Resulted from Arm's Length Negotiations

6

7    The Ninth Circuit has shown longstanding support of settlements reached through

8    arms' length negotiations by capable opponents. In *Rodriguez v. West Publishing Corp.*,

9    563 F.3d 948 (9th Cir. 2009), the Ninth circuit expressly opined that courts should defer

10   to the "private consensual decision of the [settling] Parties." *Id.* at 965, citing *Hanlon*,

11   150 F.3d at 1027. The proposed settlement is the product of arm's-length negotiations

12   facilitated by David Rotman, one of the most respected mediators in wage and hour class

     actions. Mara Decl. ¶ 39.

### C. The Balancing of Factors

13

14   The factors noted above are commonly considered at preliminary approval. The

15   factors here, in their respective levels of applicability, favor approval of the settlement.

16   Plaintiffs submit, and Burlington disputes, that this case is factually and legally strong.

17   This matter was settled after discovery that resulted in hundreds of pages of documents

18   and hundreds of thousands of lines of data. The information and data included, for

19   example, policies and best practices, meal period and rest break policies, contracts

20   between Burlington and Lyneer Staffing Solutions, Lyneer Staffing Solutions' time

21   records, attendance records, and pay records, as well as personnel files. Plaintiffs hired

22   an expert, Mr. Jarrett Gorlick, who analyzed the timekeeping and payroll data. At the

23   point the settlement was initially agreed to, no one was in a better position than

24   Plaintiffs' Counsel to understand the strengths and potential limitations of Plaintiffs'

25   case and thus evaluate the reasonableness of the amount offered in settlement. In sum,

26   "each side maintains a clear idea of the strengths and weaknesses of their respective

27

28

1  cases, such that the extent of discovery completed, and the stage of the proceedings

2  weighs in favor of preliminary approval."[21]

3      Plaintiffs contend that Burlington's failure to pay all wages owed and to provide

4  compliant meal periods and rest breaks are the predominant claims in the lawsuit. While

5  Plaintiffs believe they would successfully litigate these claims, these claims are subject

6  to risks in obtaining and maintaining certification, proving liability, and in continued

7  litigation. However, before reaching the merits of these claims, Plaintiffs would first

8  have to prove that Burlington was their employer as well as the Class Members'

9  employer and successfully certify this issue. Mara Decl. ¶ 41.

### i. Employer Status

10      All the claims alleged in this matter are based on Burlington's failure to classify

11  Plaintiffs and the Class Members as employees. Based on the interviews, staffing

12  agreements, policies, Burlington's practices, and documents produced in this matter,

13  Plaintiffs contend that Burlington substantially controls the Class Members and would

14  meet the factors delineated in the *Borello* test in *S. G. Borello & Sons, Inc. v. Department*

15  *of Industrial Relations* (1989) 48 Cal.3d 341. Because, at most, Burlington would be

16  considered a co-employer and because Burlington has not classified the Class Members

17  as independent contractors, the multi-factored analysis in *Borello,* rather than the

18  streamlined ABC test adopted by the recent Supreme Court decision in *Dynamex*

19  *Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 and recently codified at

20  Labor Code § 2750.3 (popularly referred to under its pre-passage moniker, AB 5),

21  determines whether Burlington is the employer.[22]

22  _____

23  [21] Mara Decl. ¶ 40; *see also Metrow v. Liberty Mut. Managed Care LLC*, No.
    EDCV1601133JGBKKX, 2018 WL 6265083, at *4 (C.D. Cal. Jan. 9, 2018)(Bernal J.)
24  (citing *Lewis v. Starbucks Corp.*, No. 2:07-cv-00490-MCE, 2008 WL 4196690, at *6
    (E.D. Cal. Sept. 11, 2008) for the proposition that "approval of a class action settlement
25  is proper as long as discovery allowed the parties to form a clear view of the strengths
    and weaknesses of their cases.")
26  [22] Mara Decl. ¶ 42; *see Henderson v. Equillon Enterprises, LLC* (2019) 40 Cal.App.5th
    1111 (ABC test does not apply in joint employer situation); *Curry v. Equillon*
27  *Enterprises, LLC* (2018) 23 Cal.App.5th 289 (ABC test distinguishes between
    independent contractor and employee, not employer status in a joint, co-employer
28  situation).

Plaintiffs claim that Burlington retained the right to control the manner and means of accomplishing the desired result of the Class Members' work. To this end, Plaintiffs claim that Burlington had the right to discharge at will, without cause, that the type of work performed by Class Members was that typically performed by low-wage/low skilled employees who do so under strict supervision, that Burlington supplied the place of work and instrumentalities needed to perform the work, that Class Members were paid by the hour, and that the work Class Members performed in Burlington's warehouse was part of its regular business of clothing retail. Mara Decl. ¶ 43.

Burlington disputes that it is the employer under *Borello*. Rather, Burlington maintains that, on balance, the staffing company – Lyneer Staffing Solutions – is the employer. Burlington relies on the facts that Lyneer recruits and hires Class Members, pays Class Member wages, maintains time, attendance, and wage records of Class Members, provides meal, rest period and other applicable employment policies, sets Class Member wages, and can discharge with or without cause. Thus, Burlington concludes that, although Class Members perform work at Burlington facilities, all other control under *Borello* is exerted through Lyneer, whom Burlington claims is the appropriate employer.  Mara Decl. ¶ 44.

The importance of who prevailed on the issue of employment cannot be understated. All of Plaintiffs' causes of action are predicated on satisfying the threshold issue of Burlington being deemed the employer. If the Court found otherwise, there would be no recovery. Thus, in exploring settlement, Plaintiffs had to factor in the risks associated with not prevailing on the employment issue. Mara Decl. ¶ 45.

### ii.  Challenges to Certification

While Plaintiffs remain confident in their claims, they recognize the risk to continued ligation. Namely, Burlington argues that the issue of whether workers were provided meal periods and rest breaks is not susceptible of common proof. Burlington argues that, even if it were deemed the employer, it would be a co-employer with Lyneer Staffing Solutions, who was involved in hiring, firing, and paying the putative class members. Thus, Burlington argues that the determination of whether the putative class

members were provided meal periods and rest breaks would not depend exclusively on Burlington's policies, but would also depend on whether the various Lyneer Staffing Solutions on-site managers ensured the different groups of workers they supervised were provided lawful breaks and whether Lyneer Staffing Solutions provided for meal periods and rest breaks despite Burlington's policies and practices. Although Plaintiffs are confident the common questions that would be framed for certification would avoid these problems, this variance could cast doubt on whether class treatment is appropriate and therefore had to be factored for purposes of exploring classwide settlement. Mara Decl. ¶ 46.

There is also a risk that should the Court grant certification of these claims, these claims would later be decertified. For example, in the case *Hamilton v. Wal-Mart Stores, Inc.* the district court granted certification of the unpaid wages claims based on employees going through a security checkpoint, only to later decertify them on the basis that the plaintiff was unable to set forth a workable damages model. *Hamilton*, Case No. ED CV 17-01415-AB (KKx), 2019 U.S. Dist. LEXIS 153367 *1, *41 (C.D. Cal. March 4, 2019) ("[T]he Court finds that Plaintiffs' security checkpoint subclass and Plaintiffs' overtime subclass to the extent it is based on the security checkpoint claim cannot be maintained because Plaintiffs are unable to put forth a workable damages model."). As such, if Plaintiffs' unpaid wages claim is certified, there is a risk that this class may later be decertified. Mara Decl. ¶ 47.

### iii. Liability on the Merits
#### 1. Plaintiffs' Claims for Unpaid Straight/Overtime Wages and Meal and Rest Periods Hinge on Whether Burlington Security Screenings Constitute a Sufficient Employer Control

Plaintiffs' claims for unpaid straight and overtime wages and meal and rest period violations are based on the same set of facts, *i.e.*, Burlington's security screenings employees have to satisfy upon entry and exit. Plaintiffs claim that, because of these searches, Plaintiffs are not relieved of all control for meal and rest breaks and, due to the fact that Class Members endure these screenings while they are off the clock, they are not paid straight and overtime wages while undergoing the screenings. Mara Decl. ¶ 48.

Based on the security screenings, Plaintiffs claim that their right to 30-minute meal and 10-minute rest periods, wherein employees are to be free to leave the premises without being subject to employer controls, have been violated. *See Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1038-1040 (2012); *accord Augustus v. ABM Security Services, Inc.*, 2 Cal. 5th 257, 260, 265 (2017). Because these screenings subject them to control off the clock, *i.e.*, when they are not being paid, Plaintiffs also claim that their right to be compensated for all hours subject to the employer's control has been violated. Mara Decl. ¶ 49.

Recently, the California Supreme Court, in *Frlekin v. Apple, Inc.* 8 Cal.5th 1038 (2020), issued a decision on whether security searches could constitute an unlawful control in the unpaid wage context. Although the Court found that the searches in question did rise to the level of compensable control under the Wage Order and previous precedent, the Court cautioned that whether a given search is compensable is determined on a case by case basis through a variety of factors assessing the "degree of the employer's control:"

> We also emphasize that whether an activity is required remains probative in determining whether an employee is subject to the employer's control. But, at least with regard to cases involving *onsite* employer-controlled activities, the mandatory nature of an activity is not the only factor to consider. We conclude that courts may and should consider additional relevant factors—including, but not limited to, the location of the activity, the degree of the employer's control, whether the activity primarily benefits the employee or employer, and whether the activity is enforced through disciplinary measures—when evaluating such employer-controlled conduct.

*Frlekin*, 8 Cal.5th at 1056 (emphasis in original).

There was a considerable dispute over the degree of employer control the searches at issue here occasioned on Class Members. Burlington contends that its entry/exit screenings are minimal, with most employees not even breaking stride upon entering and exiting the facility. Burlington searches bags upon entry to ensure employees are not bringing anything dangerous, *i.e.*, a weapon, into the warehouse. Burlington urges employees to either not bring in bags or bring all belongings in a clear plastic bag for quick, unhindered passage at checkpoint. The exit searches, although for a different, inventory control related purpose, bear the same hallmark according to Burlington. That

1  is, if no bag is brought out, or, if the employee does tote a bag of some sort, if it is
2  contained in a clear plastic bag, the employee is not delayed in leaving the facility.
3  Burlington contrasts its searches from those of the tech retail giant in *Apple,* wherein the
4  record showed employees were detained under the policy for up to several minutes while
5  a manager was flagged down to perform a search. Burlington employees do not have to
6  endure such wait times to comply with the policy, as there is a designated security gate
7  through which they pass.  Thus, based on these facts, Burlington contends that, on
8  balance of the factors outlined in *Apple*, its searches do not constitute an unlawful control
9  for purposes of assessing wage and meal/rest period violations. Mara Decl. ¶ 50.

10      Given the load-bearing nature of the status of the security screenings here on the
11  predominating claims for unpaid straight/overtime wages and meal and rest period
12  violations, Plaintiffs had to seriously evaluate the risk of Burlington prevailing on the
     issue in engaging in settlement discussions. Mara Decl. ¶ 51.

13      In evaluating the risks, Plaintiffs did so on a sliding scale. Whether a search rises
14  to the level of a compensable control during which employees must be paid does not fall
15  under the same analysis when analyzed in the context of meal and rest period claims.
16  Meal and rest periods enjoy a more heightened freedom from employer mandated
17  controls and intrusions than they do for purposes of evaluating the same in the unpaid
18  wage context. Whereas for purposes of evaluating whether an employer policy – like the
19  security screenings at issue here – rises to a compensable control focuses on "the degree
20  of the employer's control," Plaintiffs contend *any* employer control exerted during a
21  meal and/or rest period triggers meal and rest period liability for which an hours' worth
22  of pay is owed under Labor Code § 226.7. Mara Decl. ¶ 52.

23      In *Brinker* and *Augustus,* the California Supreme Court ruled that, "[d]uring rest
24  [and] meal periods, employers must relieve their employees of all duties and *relinquish*
25  *any control* over how employees spend their break time." *Augustus,* 2 Cal.5th at 260;
26  *see also Brinker Restaurant Corp.*, 53 Cal.4th at 1038-1039 (emphasis added). In
27  *Augustus* and the recently decided *Troester v. Starbucks Corp.*, 5 Cal.5th 829 (2019),
28  the California Supreme Court expressly pointed out that *any* intrusion during meal and

rest periods cannot be squared with the Wage Orders' protective purposes and confirmed that the analysis of what constitutes compensable control in the unpaid wage context is more onerous than for meal and rest periods. *See Augustus,* 2 Cal.5th at 271, FN 13 (multi-factored analysis for assessing compensability of on-call time is "inapposite in the context of a rest or a meal period."); *see also Troester*, 5 Cal.5th at 844-845 (reasoning that "the strict construction of a law prohibiting *any interference* with or reduction of a 10-minute rest break is difficult to reconcile with a rule that would regard a few minutes of compensable time per day as a trifle not requiring compensation if too inconvenient to record."). Based on the different legal impact the searches have on meal and rest period claims as opposed to wage claims, Plaintiffs placed a greater risk factor on the straight and overtime wage claims than the claims for meal and rest period violations when evaluating settlement.[23]

### a.  Wage Statement and Waiting Time Penalties Claims

Plaintiffs also pursued claims for failure to provide accurate itemized wage statements and waiting time penalty claims. These claims are derivative of Plaintiffs' unpaid wages claims. Should Plaintiffs' unpaid wages claims fail, these claims would also fail. Burlington argues that it would not be liable for waiting time penalties because a "good faith dispute" exists over the payment of past wages. *See* Cal. Code Regs. Tit. 8 § 13520; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201. Further, Burlington contends Plaintiffs would have to prove it "willfully" failed to pay class members appropriate wages due upon separation of employment, which Burlington contends was not willful, as it was not adjudged to be the workers' employer at the time of separation. *See* Cal. Lab. Code § 203(a). Mara Decl. ¶ 54

### b.  PAGA Claims

---

[23] Burlington disputes Plaintiffs' interpretation of California law. Specifically, Burlington contends that whether the security screenings rise to the level of unlawful control is the same analysis for wage claims as it is for meal and rest period claims. At any rate, the dispute about the legal test of what constitutes a violation is exemplary of another threshold issue that could have significant bearing on the outcome of the case if litigation continued. Mara Decl. ¶ 53.

Plaintiffs' PAGA claims are based on the same alleged unlawful conduct as their class claims. Therefore, PAGA penalties could only be awarded if the factfinder agreed with Plaintiffs' theories of liability. Should the Court agree with any of Burlington's defenses to certification or on the merits, the potential exposure for PAGA would be reduced and any associated PAGA penalties would be extinguished, as penalties can only be awarded if the Court agrees with Plaintiffs' underlying allegations. Further, these penalties would be in addition to the potential recovery from the underlying violations. Mara Decl. ¶ 55.

Section 2699, subdivision (e)(2) provides that "[i]n any action by an aggrieved employee seeking recovery of a civil penalty available under subdivision (a) or (f), a court may award a lesser amount than the maximum penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary, oppressive, or confiscatory." In *Thurman v. Bayshore Transit Management, Inc.*,[24] the court determined that an award of the maximum penalty allowed may be unjust in circumstances outside of when a defendant cannot afford to pay the maximum amount. *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal. App. 4th 1112, 1135-1136. The *Thurman* court found that penalties may be reduced when a defendant has taken its obligations to comply with the law seriously. *Id.* Burlington argues that if the case were to continue in litigation, it would be able to show that it took its obligations to comply with the law seriously such as providing an additional 15 minutes during meal periods and 5 minutes during rest breaks. As such, if Plaintiffs were able to prevail on the merits of their PAGA claims, it is likely that the Court would reduce the maximum penalty allowed. Mara Decl. ¶ 56.

### D. Range of Exposure and Reasonable Discount

The potential maximum exposure for Plaintiffs' core claims for unpaid wages, meal period, and rest break claims is approximately $4,299,418. Mara Decl. ¶ 57.

---

[24] 203 Cal. App. 4th 1112 (2012).

Based on the data Burlington provided leading up to the mediation, Plaintiffs were able to determine there were approximately 134,662 shifts in the Class Period and Class Members were paid approximately $11.61 per hour. Using 45 minutes of unpaid detention time where employees are subject to entry/exit searches, an amount of time Burlington strongly disputes for the reasons explained above, the total wage exposure would be $1,172,568 (134,662 shifts x $11.61/hour x .75 hours = $1,172,568). If Plaintiffs prevail on their meal and rest period claims, the combined total exposure for violations would be $3,126,850 (134,662 shifts x $11.61/hour x 2 violations per shift = $3,126,850). Mara Decl. ¶ 58

If Plaintiffs succeed on their PAGA claims, the PAGA group could be entitled to $36,608,000.[25] However, the assessment of PAGA penalties is left up to the discretion of the trial court, which has resulted in drastic reduction of PAGA penalties in other cases. Using the recent appellate decisions in *Kaanaana v. Barrett Business Services, Inc.,* 29 Cal.App.5th 778, 788 & 809 (2018) and *Carrington v. Starbucks*, 30 Cal.App.5th 504, 517 (2018) as a gauge of potential reduction of PAGA penalties in the event Plaintiffs were to prevail on proving violation of the underlying claims for meal/rest breaks, straight/overtime, and wage statements, Plaintiffs factored in an average of the reductions in those two cases in valuing the likely extent of PAGA exposure here, or 6.6% total PAGA exposure (*Kaanaana* – 13% and *Carrington* .2% divided by two equals 6.6%). *See Kaanaana*, 29 Cal.App.5th at 788 & 809; *see also* Carrington, 30 Cal.App.5th at 517. Thus, the likely maximum exposure for PAGA penalties was evaluated at $2,416,128. Mara Decl. ¶ 59.

The likely exposure of the core claims for unpaid wages, meal and rest period violations and PAGA penalties associated therewith was evaluated at $6,715,546. As the above explains, however, Plaintiffs had to significantly factor in the risks of prevailing in these claims, all of which are based on whether the entry/exit searches constituted unlawful controls in the context of the particular claims at issue. Plaintiffs

---

[25] 1,408 class members x $100 x 5 PAGA violations x 52 pay periods= $36,608,000.

also had to seriously factor in the risk of losing on the issue of whether Burlington is the employer under the *Borello* factors. Mara Decl. ¶ 60.

The settlement amount of $3,000,000 is a reasonable compromise of those claims and their respective risks as outlined above. The gross settlement amount is 44% of the total exposure of those core claims and provides certainty and significant cash value to the Class. Without the settlement, the Parties would be required to litigate the merits of the case—a process which is long, complex, uncertain and expensive. Burlington would conduct further motion practice to defend against Plaintiffs' claims such as seek summary judgment on the employment relationship issue and oppose any motion for class certification. Settlement of this matter will conserve the resources of this Court and the Parties, thus weighing in favor of preliminary approval.[26]

Courts in the Ninth Circuit have observed that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery." *Telecomm. Corp. v. DirectTV*, 221 F.R.D. 523, 527 (C.D. Cal. 2004). The settlement here of $3,000,000 is fair, adequate, and reasonable when considering that it provides class members with a definite and substantial recovery in proportion to the strengths and challenges associated with establishing Burlington as the class members' employer, achieving and maintaining certification on all claims, and establishing liability for all claims. Mara Decl. ¶ 62.

## VII.    NATURE AND METHOD OF NOTICE

### A. Data to Administrator and Notice Mailing

The Class Data is due to CPT within 40 calendar days of the Court's entry of preliminary approval. *See* Mara Decl., Ex. 1 at ¶¶ 65, 95. CPT will then have 14 calendar days to complete any skip trace and updating the Class Members' addresses and contact information and prepare and mail the notice of settlement to all Class Members. *See Id.*

---

[26] Mara Decl. ¶ 61; *accord Metrow v. Liberty Mut. Managed Care LLC,* No. EDCV1601133JGBKKX, 2018 WL 6265083, at *5 (C.D. Cal. Jan. 9, 2018) (Bernal J.); *Gonzalez v. BMC W., LLC,* No. EDCV1700390JG BRAOX, 2018 WL 3830774, at *6 (C.D. Cal. May 23, 2018) (Bernal J.); *Byrne v. Santa Barbara Hosp. Servs., Inc.*, No. EDCV17527JGBKKX, 2017 WL 5035366, at *9 (C.D. Cal. Oct. 30, 2017) (Bernal J.).

at ¶¶ 67, 95. If a notice of settlement is returned to CPT as undeliverable, CPT will use the National Change of Address Database and skip traces to attempt to find the current address. *See* Mara Decl., Ex. 1 at ¶¶ 65-69.

As part of the settlement administration process, CPT will maintain a website dedicated to the Settlement, and hosting the Joint Stipulation, Class Notice, preliminary approval motion, attorney fee motion, and final approval motions. *See* Mara Decl., Ex. 1 at ¶ 58.

Class Members will have 60 days from the mailing date of the notice of settlement to opt-out or object to the settlement. *See* Mara Decl., Ex. 1 at ¶ 39.

## B. The Notice Method Meets the Requirements of Rule 23

Rule 23 (c)(2) requires that the notice inform prospective class members of (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through counsel if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members under Rule 23 (c)(3) generally requires the same concepts. "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." Newberg, 2 *Newberg on Class Actions* §8.32 at 8-103f. The proposed notice of settlement meets all these requirements. Thus, it is respectfully requested the Court find that the notice of settlement adequately notifies the Class of the proposed settlement.

## VIII.    CLASS ACTION FAIRNESS ACTION NOTICE

This action was removed pursuant to the Class Action Fairness Act of 2005 (CAFA), codified in part at 28 U.S.C. § 1332(d). Pursuant to 28 U.S.C. § 1715, Burlington is required to give notice of the proposed settlement to the appropriate State official of each State in which a class member resides and the appropriate Federal office within ten (10) days after the proposed settlement is filed in court. 28 U.S.C. § 1715(b).

If Burlington has not already given such notice, this notice must be given no later than August 6, 2020.

## IX.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant preliminary approval of the proposed settlement, conditionally certify the class, enter the proposed preliminary approval order submitted herewith, and set a final approval/final fairness hearing date.

Dated: July 27, 2020                    **MARA LAW FIRM, PC**

                                        /s/ *David Mara*
                                        David Mara, Esq.
                                        Jamie Serb, Esq.
                                        Tony Roberts, Esq.
                                        Attorneys for Plaintiffs