1   David Mara, Esq. (SBN 230498)
2   Tony Roberts, Esq. (SBN 315595)
    **MARA LAW FIRM, PC**
3   2650 Camino Del Rio North, Suite 205
4   San Diego, California 92108
    Tel: (619) 234-2833
5   Fax: (619) 234-4048

6   Attorneys for Plaintiffs Amanda Gonzalez
7   and Audriana Gonzalez

8

9                        **UNITED STATES DISTRICT COURT**

10                       **CENTRAL DISTRICT OF CALIFORNIA**

11   AMANDA GONZALEZ and              CASE NO. 5:18-cv-00666-JGB-SP
     AUDRIANA GONZALEZ on behalf
12   of themselves, all others similarly   Honorable Jesus G. Bernal
     situated and on behalf of the general
13   public,                          **PLAINTIFFS' NOTICE OF MOTION
                                      AND MOTION FOR FINAL
14                                    APPROVAL OF CLASS ACTION
              Plaintiffs,             SETTLEMENT AND ENTRY OF
15                                    JUDGMENT**

16   v.                              Date:        March 1, 2021
                                     Time:        9:00 a.m.
17   BURLINGTON COAT FACTORY         Courtroom:   1
     WAREHOUSE CORPORATION
18   and DOES 1-10,
                                     Filed:       February 27, 2018
19            Defendants.            FAC Filed:   October 31, 2018
                                     Trial Date:  None
20

21

22

23

24

25

26

27

28

**TO THE HONORABLE JESUS G. BERNAL, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs Amanda Gonzalez and Audriana Gonzalez move this Court for an order granting Plaintiffs' Motion for Final Approval of Class Action Settlement and an entry of judgment.

This motion is set for determination on March 1, 2021, at 9:00 a.m. in Courtroom No. 1 in the above-entitled courthouse located at 3470 Twelfth Street, Riverside, CA 92501. This Motion is based upon this notice, the accompanying Memorandum of Points & Authorities filed herewith, the accompanying Declaration of David Mara, Esq. filed herewith, the Declaration of Plaintiff Amanda Gonzalez, the Declaration of Plaintiff Audriana Gonzalez, the Declaration of Bryan Valdez of CPT Group, Inc., the Joint Stipulation of Class Action and PAGA Representative Action Settlement and Release and all exhibits thereto, the Court's Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, the filings on record in this case, and upon such further evidence, both documentary and oral, that may be presented at the hearing of this motion.

Dated: January 26, 2021

**MARA LAW FIRM, PC**

By: */s/ David Mara*
David Mara, Esq.
Tony Roberts, Esq.
Attorneys for Plaintiffs

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ....................................... 2

III.   SUMMARY OF SETTLEMENT ................................................. 3

       A.    The Class ..................................................... 3

       B.    The Maximum Settlement Amount.................................. 4

       C.    Calculation of the Settlement Payments ....................... 4

       D.    Funding and Distribution of Settlement Funds ................. 6

       E.    Uncashed Checks and Cy Pres Beneficiary ...................... 6

       F.    Released Claims .............................................. 7

IV.    The Settlement Notice Process Was Successful ....................... 8

       A.    The Class Members Overwhelmingly Support the Settlement......... 8

V.     DISCUSSION........................................................ 8

       A.    The Settlement Meets the Standards Governing Final Approval ........... 8

             i.    The Settlement was a Result of Arm's-Length Negotiations ........... 10

             ii.   *In re Bluetooth* Factors are not Present Here ..................... 10

       B.    The Settlement is Fair ............................................ 11

       C.    The Parties' Conflicting Positions Presented Risks In Further Litigation
             .................................................................. 12

             i.    Employer Status ............................................... 12

             ii.   Challenges to Certification.................................... 13

             iii.  Risks on the Merits........................................... 14

                   1.   Plaintiffs' Claims for Unpaid Straight/Overtime Wages and Meal and
                        Rest Periods Hinge on Whether Burlington Security Screenings
                        Constitute a Sufficient Employer Control ...................... 14

                        a.   Wage Statement and Waiting Time Penalties Claims.................. 17

                        b.   PAGA Claims................................................. 17

       D.    Thorough Investigation and Discovery Has Occurred ........................ 19

1        E.     Class Counsel Have Extensive Experience Acting as Class Counsel .. 19

2        F.     The Class Members' Response to the Settlement is Further Evidence

3             That the Settlement is Fair and Reasonable ......................................... 20

4        G.    The Court Should Approve the Settlement Administration Fee........... 20

5        H.    The Court Should Approve the PAGA Payment to the LWDA ........... 20

6   VI.    CLASS ACTION FAIRNESS ACT NOTICE................................................. 21

7  VII.   CONCLUSION .............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Amaral v. Cintas Corp.*,
  163 Cal.App.4th 1157, 1201 (2008)........................................................... 17

*Augustus v. ABM Security Services, Inc.*,
  2 Cal. 5th 257, 260, 265 (2017)........................................................ 15, 17

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610, 622 (N.D. Cal. 1979) .................................................. 10

*Brinker Restaurant Corp. v. Superior Court*,
  53 Cal.4th 1004, 1038-1040 (2012)............................................. 15, 16, 19

*Class Plaintiffs v. Seattle*,
  955 F.2d 1268, 1276 (9th Cir. 1992) ........................................................ 9

*Curry v. Equillon Enterprises, LLC*,
  23 Cal.App.5th 289 (2018) ...................................................................... 12

*Dynamex Operations West, Inc. v. Superior Court*,
  4 Cal.5th 903 (2018) ............................................................................... 12

*Frlekin v. Apple, Inc.*,
  8 Cal.5th 1038 (2020).......................................................................... 15, 16

*H&R Block Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96, 116 (2d Cir. 2005) .............................................................. 10

*Hamilton v. Wal-Mart Stores, Inc.*, Case No. ED CV 17-01415-AB (KKx),
  2019 U.S. Dist. LEXIS 153367 *1, *41 (C.D. Cal. March 4, 2019) ..................... 14

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011, 1026 (9th Cir. 1998)................................................ 8, 9, 10, 11

*Henderson v. Equillon Enterprises, LLC*,
  40 Cal.App.5th 1111 (2019) ..................................................................... 12

*In re Bluetooth Headset Products Liability Litigation* (“*Bluetooth*”),
  654 F.3d 935, 946 (9th Cir. 2011)........................................................ 10, 11

*In re Heritage Bond Litigation*,

    2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) ................................. 9

*Joel A. v. Giuliani*,

    218 F.3d 132, 138 (2d Cir. 2000) ............................................................................ 8

*Kirkorian v. Borelli*,

    695 F. Supp. 446, 451 (N.D. Cal. 1988) ............................................................... 10

*Linney v. Cellular Alaska P'ship*,

    151 F.3d 1234, 1242 (9th Cir. 1998) ..................................................................... 11

*Mandujano v. Basic Vegetable Products, Inc.*,

    541 F. 2d 832, 837 (9th Cir. 1976) ....................................................................... 20

*Marshall v. Holiday Magic*, *Inc.*,

    550 F.2d 1173 (9th Cir. 1977) ............................................................................... 11

*Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*,

    688 F.2d 615, 625 (9th Cir. 1982) ........................................................................ 11

*Officers for Justice v. Civil Service Comm. of City and County of San Francisco*,

    688 F. 2d 615, 625 (9th Cir. 1982) ....................................................................... 11

*Rodriguez v. West Publishing Corp.*,

    563 F.3d 948 (9th Cir. 2009) ................................................................................ 10

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*,

    48 Cal.3d 341 (1989) ............................................................... 9, 12, 13, 18

*Thurman v. Bayshore Transit Management, Inc*.,

    203 Cal. App. 4th 1112, 1135-1136 (2012) ......................................................... 18

*Troester v. Starbucks Corp.*,

    5 Cal.5th 829 (2019)................................................................................... 16, 17

*Van Ba Ma v. Covidien Holding, Inc.*,

    2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) ........................................ 11

1

**Statutes**

2    28 U.S.C. § 1332(d) ............................................................................ 21

3    28 U.S.C. § 1715 ................................................................................ 21

4    28 U.S.C. § 1715(b) ........................................................................... 21

5    California Code Regulations Title 8 § 13520 ..................................... 17

6    California Labor Code § 203(a) .......................................................... 17

7    California Labor Code § 226.7 ........................................................... 16

8    California Labor Code § 2750.3 .......................................................... 12

9    Federal Rules Civil Procedures 23(e) ................................................... 8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Amanda Gonzalez and Audriana Gonzalez ("Plaintiffs") seek final approval of a proposed non-reversionary $3,000,000.00 wage and hour class action settlement entered into between Plaintiffs and Defendant Burlington Coat Factory Warehouse Corporation ("Burlington" or "Defendant") on behalf of 5,776 Class Members. The Class Members are comprised of all current and/or former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions[1] who worked one or more shifts in a workweek at Burlington's distribution centers located in California at any time between February 27, 2014 and August 21, 2020 (the "Class Period"). There is an overwhelming participation rate amongst Class Members as there were no requests for exclusion and no objections. Participating Class Members[2] shall automatically receive their share of the Settlement without needing to submit a claim form. The settlement is projected to pay each Class Member an average of $322.15,[3] less applicable taxes for the wages portion of the settlement share.

In addition, Plaintiffs move for final approval of (1) attorneys' fees in the amount of $750,000 which represents 25% of the Maximum Settlement Amount ("MSA"); (2) litigation costs in the amount of $25,826.97, all of which was incurred in litigating this matter; (3) Class Representative Service Awards in the amount of $7,500.00 each; (4) CPT Group, Inc.'s settlement administration fees and expenses in the amount of $45,000; and (5) the Labor and Workforce Development Agency's share of the PAGA Payment in the amount of $225,000, which is 75% of the $300,000 allocated to settle PAGA penalties.

---

[1] "Lyneer Staffing Solutions" means Lyneer Staffing Solutions, Infinity Staffing Solutions, LLC dba Lyneer Staffing Solutions, Staff4Jobs, LLC dba Lyneer Staffing Solutions, Employers HR LLC, Ciera Staffing, LLC, Lyneer Staffing Solutions, LLC, and all of their members, predecessors, successors, affiliates, and related companies, including but not limited to, Gary Spinner, Todd McNulty, James Radvany, Bryan Smith, Brian Henderson, Marti White and Greg Lomonaco.

[2] "Participating Class Members" are Class Members who do not opt-out of the Settlement or who opt-out but subsequently rescinds the opt-out in a timely manner. *See* Joint Stipulation of Class Action and PAGA Representative Action Settlement and Release ("Joint Stipulation"), Dkt. No. 39-1, pg. #511, ¶ 34.

[3] Declaration of Bryan Valdez on behalf of CPT Group, Inc. ("Valdez Decl.") ¶ 9.

This case required a substantial amount of attorney time from Class Counsel and sought relief on behalf of 5,776 hourly non-exempt Class Members during the Class Period. This litigation involved interviews with Class Members and a significant investigation and exchange of discovery and data prior to mediation. The requested amounts of attorneys' fees, litigation costs, class representative awards, settlement administration costs, and PAGA payment were fully disclosed to the Class Members when the Class Notice was mailed to them on September 30, 2020. Most importantly, **the Settlement and all its terms received resounding support from Class Members as there were no objections and no requests for exclusion**.[4] The Court is therefore respectfully requested to honor the Class Members' endorsement of the settlement and grant final approval of the settlement, attorneys' fees, litigation costs, class representative service payments, costs of settlement administration, and payment to the LWDA and PAGA Group Members in the amounts as preliminarily approved by this Court, as fully disclosed to the Class Members, and as requested herein.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Burlington is an off-price retailer with operations in California.  The company ships products from distribution centers in San Bernardino and Redlands as part of its supply chain operation. Burlington utilizes temporary workers from Lyneer Staffing Solutions at its distribution centers to assist with the flow of merchandise during the distribution process. This class settlement involves non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California. See Declaration of David Mara ("Mara Decl.") at ¶ 22.

Plaintiffs filed their Complaint on February 27, 2018. See Dkt. No. 1. On March 29, 2018, Burlington filed an Answer and later removed this matter on April 2, 2018. Id.

On October 1, 2018, Plaintiffs filed their First Amended Complaint, which Burlington answered on October 31, 2018. See Dkt. No.'s 17, 20. Plaintiffs allege that

---

[4] *See* Valdez Decl. ¶¶ 6-7.

as a result of uncompensated time spent in security lines/bag checks, among other things, they and the putative class were not paid all wages due, including all overtime hours at the applicable premium rates of pay, all applicable minimum wages, and compensation for all hours worked, were not provided meal period and rest breaks or paid additional sums of money in lieu thereof, were not furnished accurate paystubs, were not paid all wages due at termination of employment, and they allege that these practices violated California's Unfair Competition Law. Id. Plaintiffs also allege claims for Burlington's failure to provide recovery periods and failure to produce personnel records and failure to produce wage records. Id.

On January 3, 2019, the Parties attended mediation with Jeff Ross. At the first mediation, the Parties found unintended flaws in the data—i.e., the number of shifts used in the Parties exposure analysis was inflated for many temporary workers. As such, the Parties agreed to reschedule the mediation. See Mara Decl. ¶ 49.

On October 15, 2019, the Parties attended a second mediation with David Rotman. The mediation resulted in a mediator's proposal later accepted by both Parties. The Parties' memorialized the settlement in a long form agreement and now seek the Court's approval of their Joint Stipulation. See Mara Decl. ¶ 50.

As part of this settlement, Plaintiffs amended their complaint adding PAGA claims into their wage and hour class action. Plaintiffs filed their Second Amended Complaint on August 25, 2020. *See* Dkt. No. 42.

### III.   SUMMARY OF SETTLEMENT

The principle terms of the Joint Stipulation are as follows:

### A. The Class

The Class is comprised of: All current and/or former non-exempt, non-union, hourly employees provided as temporary workers by Lyneer Staffing Solutions who worked one or more shifts in a workweek at Burlington's distribution centers located in California at any time between February 27, 2014 and August 21, 2020. There are 5,776 individuals who fall within this Class definition. *See* Mara Decl. ¶ 23.

**B. The Maximum Settlement Amount**

The Parties have agreed (subject to and contingent upon the Court's approval) that this action be settled and compromised for the non-reversionary total sum of $3,000,000 ("Maximum Settlement Amount" or "MSA"), which includes, subject to Court approval: (a) attorneys' fees of up to $750,000 (25% of the MSA) to compensate Class Counsel for work already performed and all work remaining to be performed in documenting the settlement, administrating the settlement, and securing Court approval; (b) litigation expenses of $25,826.97 (originally estimated not to exceed $50,000); (c) Class Representative Service Payments to the named class representatives, Amanda Gonzalez and Audriana Gonzalez, in a sum not to exceed $7,500 each in consideration for agreeing to a general release of their claims against Burlington that is broader than that of other class members, and in recognition of their efforts in prosecuting the action; (d) claims administration fees and expenses to CPT Group, Inc. ("CPT" or the "Settlement Administrator") of $45,000; (e) Burlington's employer payroll taxes; and, (e) PAGA payment to the LWDA in the amount of $225,000 (which represents seventy-five percent (75%) of $300,0000 allocated to PAGA). Mara Decl. ¶ 24;

**C. Calculation of the Settlement Payments**

After all deductions and employer payroll tax obligations have been made, it is estimated that $1,860,726.53 ("Net Settlement Amount" or "NSA"),[5] less withholdings for federal and state taxes on the amounts deemed wages, will be available for disbursement—$75,000 in PAGA penalties for PAGA Group Members and $1,785,726.53 in wages, interest, and penalties for Participating Class Members,

---

[5] $3,000,000 MSA - $45,000 (administration costs) - $25,826.97 (costs) - $750,000 (attorneys' fees) -  $15,000 (service awards) - $225,000 (LWDA share of PAGA penalties)= $1,939,173.03 after deductions. Of the $1,939,173.03, $75,000 is paid to PAGA Group members as their share of the PAGA penalties and the remaining $1,864,170.03 is wages, interest, and penalties. $621,328.87 (or one-third) of the $1,864,170.03 is attributable to wages ($1,864,170.03 x .3333). The employer taxes are estimated by using the highest possible tax rate available for 2021, which is 14.45%. Because employer taxes are to be deducted, the following formula is used: $621,328.87/1.1445=$542,882.37. $542,882.37 is the amount of wages not including the employer taxes. The difference between $621,328.87 - $542,882.37 provides the estimated employer taxes of $78,446.50. Subtracting $78,446.50 from $1,939,173.03 results in the $1,860,726.53 NSA. Mara Decl. ¶ 26.

resulting in an average payment of \$322.15[6] per Class Member. Per the Agreement, the term "Participating Class Member" is defined as any Class Member who does not opt-out of the Settlement or who opts-out but subsequently rescinds the opt-out in a timely manner. The money available for payout to these individuals comes out of the NSA, which is what remains of the MSA after subtracting all Court approved attorneys' fees and costs, the Class Representative Enhancement Payment, settlement administration costs, the LWDA's portion of the PAGA Payment, and the employer's payroll tax obligation. Mara Decl. ¶ 25.

> Each Individual Settlement Payment will be calculated as follows:

> The Settlement Administrator shall … pay each Participating Class Member a pro rata portion of the Net Settlement Amount based on the number of weeks he or she worked as a Class Member. That pro rata portion shall be determined by dividing the total number of weeks worked as a Class Member by all members of the Class into the amount of the Net Settlement Amount to arrive at an amount per week; then, for each eligible Class Member, multiplying that amount times the number of weeks the Settlement Administrator determines that such individual was working as a Class Member.[7]

Accordingly, each Class Member's settlement share ties directly to the number of weeks that Class Member worked at a Burlington distribution center during the relevant time period. *Under no circumstances will any portion of the \$3,000,000.00 settlement revert to Burlington.*

One-Third (1/3) of each Settlement Payment is intended to settle each Class Member's claims for alleged unpaid wages. This wage portion will be reduced by applicable payroll tax withholdings. The Settlement Administrator will issue an IRS

---

[6] \$1,860,726.53 divided by 5,776 Class Members equates to \$322.15 per Class Member. Mara Decl. ¶ 27.

[7] *See* Joint Stipulation, Dkt. No. 39-1, pg. #519, ¶ 54(e)(ix). The Settlement Administrator will also conduct a similar pro rata calculation for each PAGA Group Member to determine their share of the PAGA Group Payment and pay those amounts in a separate check to all PAGA Group Members. Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked divided by (ii) the total number of weeks worked by all Participating Class Members based on the same Class Data, which is then multiplied by the Net Settlement Amount. One day worked in a given week will be credited as a work week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the amount of weeks that he or she worked. *Id.* at ¶ 54(e)(x).

Form W-2 to each Participating Class Member with respect to the wage portion of his/her Settlement Payment. *See* Joint Stipulation, Dkt. No. 39-1, pg. #527, ¶ 61.

Two-Thirds (2/3) of the Settlement Payment is intended to settle each Class Member's claims for interest and penalties. This non-wage portion will not be reduced by payroll tax withholding and deductions. The Settlement Administrator will issue to each Participating Class Member an IRS Form 1099 with respect to this non-wage portion of his/her Settlement Payment. All PAGA Group Payments will be allocated entirely to penalties and reported on IRS 1099 Forms. *Id.*

### D. Funding and Distribution of Settlement Funds

Subject to the Court's final approval and provided there are no objections or appeals to the Court's final approval order and judgment, the MSA shall be funded by Burlington within 10 days after the Settlement Effective Date.[8]

### E. Uncashed Checks and Cy Pres Beneficiary

Pursuant to the Joint Stipulation, any checks issued to Participating Class Members shall remain valid and negotiable for 180 days from the date of issuance. The Parties agreed that the funds from any uncashed checks will be sent to a cy pres beneficiary, the United Way of California.[9] If any checks remain uncashed or not

---

[8] *See* Joint Stipulation, Dkt. No. 39-1, pg.'s #512, #538-541, ¶¶ 43, 95. "Settlement Effective Date" means thirty (30) calendar days after entry of the Final Approval Order. If an appeal or motion to intervene is filed, then "Settlement Effective Date" means the date of final resolution of any appeal from the Final Approval Order where the resolution affirms the Final Approval Order. The Settlement Effective Date cannot occur, and Defendant will not be obligated to fund this Settlement, unless and until there is no possibility of an appeal or further appeal (by anyone who has the right to, or claims to have the ability to, take an appeal) that could potentially prevent this Settlement Agreement from becoming final and binding. The Parties intend that the Final Approval Order will effectuate the releases and extinguish all released claims, including but not limited to PAGA claims, for the periods covered by this Settlement on the Settlement Effective Date. The Court will retain jurisdiction to enforce the Settlement after the Settlement Effective Date.
[9] The Parties chose the United Way of California as the cy pres beneficiary. The United Way of California is an umbrella organization, supporting multiple local United Ways throughout the state that all serve the public by working towards financial stability of the citizens they support. The United Way has specific programs aimed at promoting steady, gainful employment of Californians, something that meets the objectives of a lawsuit brought with the aim of enforcing employee rights, and supports silent class members through the variety of programs offered. For example, the United Way institutes local programs offering job coaching and training, career development, and

deposited by the expiration of the 90-day period after mailing the reminder notice, the Settlement Administrator will mail a reminder notice to these individuals. *Id.* The Settlement Administrator will deposit with the Cy Pres Beneficiary any funds that were allocated to Participating Class Members who did not cash their settlement check within 180 days of mailing. *Id.*

### F.  Released Claims

In exchange for Burlington's promise to make the payments provided for in the Joint Stipulation, "[t]he releases agreed upon and made part of the settlement by Participating Class Members ("Settlement Class Released Claims") shall include a release of Releasees[10] … of the Settlement Class Released Claims.  Settlement Class Released Claims are any and all wage and hour claims that accrued during or prior to the Class Period and that were or could have been asserted in the instant Action based on the allegations in any pleading in the Action, including the Second Amended Complaint, whether such claims were asserted or not, including but not limited to any and all claims for straight time, overtime, minimum wage, meal and rest breaks, recovery periods, wage statements, waiting time penalties, unfair competition, failure to produce personnel or wage records, and claims under the California Labor Code Private Attorneys General Act, Labor Code §§ 2699, *et seq.* ("PAGA"), as well as any and all state or federal claims that are derivative or directly related to the foregoing claims, including any claims for wages, penalties, premium pay, punitive damages, and interest, and/or under the common law, such as conversion and unjust enrichment, and any claims under the California Business & Professions Code.  All Participating Class Members

---

business development, providing the skills needed to find and maintain a lifelong career. Beyond just programs supporting job seekers and employees, the United Way also advocates at the policy level for an increase to the State minimum wage. *See* Joint Stipulation, Dkt. No. 39-1, pg.'s #508, #595-596, ¶¶ 11, 37, 95

[10] "Releasees" means each and all of Burlington Coat Factory Warehouse Corporation, Lyneer Staffing Solutions (as defined above), and each of their respective predecessors, successors and assigns, their current and former direct and indirect parents, affiliates, subsidiaries, divisions, and related business entities, and their current and former officers, directors, shareholders, employees, agents, representatives and employee benefit programs (including the trustees, administrators, fiduciaries and insurers of such programs). *See* Dkt. No. 39-1, pg. #511, ¶ 37.

shall be bound by the release unless they formally opt-out. The PAGA Group shall be bound by the release as to any PAGA claims even if they have formally opted-out of the Class." *See* Joint Stipulation, Dkt. No. 39-1, pg. #534, ¶ 85. The release covers facts that were alleged or could have been alleged in Plaintiffs' complaint and PAGA letter, as such the release is tied to the facts contained therein. Only the named Plaintiffs have agreed to a general release of all claims, including a waiver under California Civil Code section 1542.

**IV.    The Settlement Notice Process Was Successful**

**A. The Class Members Overwhelmingly Support the Settlement**

On August 21, 2020, the Court granted preliminary approval, conditionally certified the Class, appointed CPT to act as the Settlement Administrator, approved the notice to be sent to the Class, and directed that the notice be mailed to the Class by First Class U.S. Mail. Mara Decl. ¶ 28. On September 30, 2020, CPT mailed notice packets via U.S. first-class mail to 5,776 Class Members. Out of the total 5,776 notice packets mailed to Class Members only one notice was deemed undeliverable. Valdez Dec. ¶¶ 4-5.

In sum, the settlement receives overwhelming support from the Class Members. Specifically, **there are no objections and no requests for exclusion**. Valdez Dec. ¶¶ 6-7. Thus, 100% of the 5,776 Class Members are Participating Class Members who will be issued settlement payments. **Under no circumstances will any portion of the settlement revert to Burlington.** Mara Decl. ¶ 29.

**V.    DISCUSSION**

**A. The Settlement Meets the Standards Governing Final Approval**

Matters filed as class actions require court approval before a settlement can be consummated. *See* Fed. R. Civ. Proc. ("FRCP") 23(e). Per FRCP 23 (e), any compromise of a class action must receive Court approval. The Court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).

In determining whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) (*citing Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Approval of a class action settlement involves a two-step process. In determining whether to grant final approval of the settlement, a court examines the terms for overall fairness and, in so doing, balances the following factors: the strength of the plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed; the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and, the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026.

Here, the proposed settlement was reached only after undertaking a robust factual and legal investigation into the claims and defenses in this lawsuit. The settlement amount takes into consideration the risks of prevailing on Plaintiffs' claims. Plaintiffs also had to seriously factor in the risk of losing on the issue of whether Burlington is the employer under the *Borello* factors. Without the settlement, the Parties would be required to litigate the merits of the case—a process which is long, complex, uncertain and expensive. Burlington would conduct further motion practice to defend against Plaintiffs' claims such as seek summary judgment on the employment relationship issue and oppose any motion for class certification. Settlement of this matter will conserve the resources of this Court and the Parties, thus weighing in favor of settlement. The settlement here of $3,000,000 is fair, adequate, and reasonable when considering that it provides class members with a definite and substantial recovery in proportion to the strengths and challenges associated with establishing Burlington as the class members' employer, achieving, and maintaining certification on all claims, and establishing liability for all claims. In light of these risks, the settlement amount is well within the ballpark of reasonableness.

### i.  The Settlement was a Result of Arm's-Length Negotiations

The Ninth Circuit has shown longstanding support of settlements reached through arms-length negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), the Ninth Circuit expressly opined that courts should defer to the "private consensual decision of the [settling] parties."  *Id.* at 965, citing *Hanlon*, 150 F.3d at 1027. "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *H&R Block Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005); *see also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (opinion of experienced counsel is entitled to considerable weight); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (recommendations of plaintiffs' counsel should be given a presumption of reasonableness). The settlement is the product of arms-length negotiations facilitated by Mr. Rotman, one of the most respected mediators in wage and hour class actions. *See* Mara Decl. ¶ 50.

### ii.  *In re Bluetooth* Factors are not Present Here

In *Bluetooth,* the Ninth Circuit articulated additional factors that need to be considered, especially where a settlement has been reached prior to formal class certification. *In re Bluetooth Headset Products Liability Litigation* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011). As such, settlement agreements reached prior to class certification must withstand a higher level of scrutiny for signs of collusion or other conflicts of interest than ordinarily are required under Rule 23(e). The three signs *Bluetooth* instructs trial courts to look for are:

1. When class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
2. When the parties negotiate a 'clear sailing' arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by defendant;
3. When the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

1   *Id* at 947. This settlement passes the *Bluetooth* test. The NSA is almost two and

2   a half times larger than the fees requested by Class Counsel, which is the accepted

3   federal benchmark of 25% of the MSA. Additionally, any amount requested by Class

4   Counsel and not awarded by the Court shall become part of the NSA and distributable

5   to Participating Class Members. Accordingly, unlike the settlement agreement in

6   *Bluetooth,* the instant settlement cannot be said to arouse suspicion of collusion.

7   ## B. The Settlement is Fair

8   When evaluating the settlement terms for purposes of ruling on whether to

9   finally approve it, the Court is to review the strength of a plaintiff's case, including "the

10  probable outcome of a trial on the merits of liability and damages as to the claims, issues,

11  or defenses of the class and individual class members." *Van Ba Ma v. Covidien Holding,*

12  *Inc.*, 2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) (*citing Marshall v. Holiday*

13  *Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977)). In ruling on final approval, the "fairness

14  hearing is not to be turned into a trial or a rehearsal for trial on the merits." *Id.* (*quoting*

15  *Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688

    F.2d 615, 625 (9th Cir. 1982)).

16  There is no standard or benchmark for determining whether a settlement is fair.

17  "Ultimately the district court's determination is nothing more than 'an amalgam of

18  delicate balancing, gross approximations and rough justice.'" *Officers for Justice v. Civil*

19  *Service Comm. of City and County of San Francisco*, 688 F. 2d 615, 625 (9th Cir. 1982).

20  A court should weigh the benefits that the settlement will realize for the class against

21  the uncertainty of litigation and the possibility that the class members would obtain no

22  relief in the absence of a settlement. *See Linney v. Cellular Alaska P'ship*, 151 F.3d

23  1234, 1242 (9th Cir. 1998) ("...it is the very uncertainty of outcome in litigation and

24  avoidance of wasteful and expensive litigation that induce consensual settlements."); *see*

25  *also Hanlon*, 150 F.3d at 1026 (When considering the fairness of a proposed class

26  settlement, courts consider the strength of a plaintiff's case against the risk, expense,

27  complexity and likely duration of further litigation.).

28

## C. The Parties' Conflicting Positions Presented Risks In Further Litigation

Plaintiffs submit, and Burlington disputes, that this case is factually and legally strong. Plaintiffs contend that Burlington's failure to pay all wages owed and to provide compliant meal periods and rest breaks are the predominant claims in the lawsuit. While Plaintiffs believe they would successfully litigate these claims, these claims are subject to risks in obtaining and maintaining certification, proving liability, and in continued litigation. However, before reaching the merits of these claims, Plaintiffs would first have to prove that Burlington was their employer as well as the Class Members' employer and successfully certify this issue. Mara Decl. ¶ 30.

### i. Employer Status

All the claims alleged in this matter are based on Burlington's failure to classify Plaintiffs and the Class Members as employees. Based on the interviews, staffing agreements, policies, Burlington's practices, and documents produced in this matter, Plaintiffs contend that Burlington substantially controls the Class Members and would meet the factors delineated in the *Borello* test in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (1989). Because, at most, Burlington would be considered a co-employer and because Burlington has not classified the Class Members as independent contractors, the multi-factored analysis in *Borello,* rather than the streamlined ABC test adopted by the recent Supreme Court decision in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 and recently codified at Labor Code § 2750.3 (popularly referred to under its pre-passage moniker, AB 5), determines whether Burlington is the employer.[11]

Plaintiffs claim that Burlington retained the right to control the manner and means of accomplishing the desired result of the Class Members' work. To this end, Plaintiffs

---

[11] Mara Decl. ¶ 31; *see Henderson v. Equillon Enterprises, LLC*, 40 Cal.App.5th 1111 (2019) (ABC test does not apply in joint employer situation); *Curry v. Equillon Enterprises, LLC*, 23 Cal.App.5th 289 (2018) (ABC test distinguishes between independent contractor and employee, not employer status in a joint, co-employer situation).

claim that Burlington had the right to discharge at will, without cause, that the type of work performed by Class Members was that typically performed by low-wage/low skilled employees who do so under strict supervision, that Burlington supplied the place of work and instrumentalities needed to perform the work, that Class Members were paid by the hour, and that the work Class Members performed in Burlington's warehouse was part of its regular business of clothing retail. Mara Decl. ¶ 32.

Burlington disputes that it is the employer under *Borello*. Rather, Burlington maintains that, on balance, the staffing company – Lyneer Staffing Solutions – is the employer. Burlington relies on the facts that Lyneer recruits and hires Class Members, pays Class Member wages, maintains time, attendance, and wage records of Class Members, provides meal, rest period and other applicable employment policies, sets Class Member wages, and can discharge with or without cause. Thus, Burlington concludes that, although Class Members perform work at Burlington facilities, all other control under *Borello* is exerted through Lyneer, whom Burlington claims is the appropriate employer. Mara Decl. ¶ 33.

The importance of who prevailed on the issue of employment cannot be understated. All of Plaintiffs' causes of action are predicated on satisfying the threshold issue of Burlington being deemed the employer. If the Court found otherwise, there would be no recovery. Thus, in exploring settlement, Plaintiffs had to factor in the risks associated with not prevailing on the employment issue. Mara Decl. ¶ 34.

### ii. Challenges to Certification

While Plaintiffs remain confident in their claims, they recognize the risk to continued ligation. Namely, Burlington argues that the issue of whether workers were provided meal periods and rest breaks is not susceptible of common proof. Burlington argues that, even if it were deemed the employer, it would be a co-employer with Lyneer Staffing Solutions, who was involved in hiring, firing, and paying the putative class members. Thus, Burlington argues that the determination of whether the putative class members were provided meal periods and rest breaks would not depend exclusively on Burlington's policies, but would also depend on whether the various Lyneer Staffing

Solutions on-site managers ensured the different groups of workers they supervised were provided lawful breaks and whether Lyneer Staffing Solutions provided for meal periods and rest breaks despite Burlington's policies and practices. Although Plaintiffs are confident the common questions that would be framed for certification would avoid these problems, this variance could cast doubt on whether class treatment is appropriate and therefore had to be factored for purposes of exploring classwide settlement. Mara Decl. ¶ 35.

There is also a risk that should the Court grant certification of these claims, these claims would later be decertified. For example, in the case *Hamilton v. Wal-Mart Stores, Inc.* the district court granted certification of the unpaid wages claims based on employees going through a security checkpoint, only to later decertify them on the basis that the plaintiff was unable to set forth a workable damages model. *Hamilton,* Case No. ED CV 17-01415-AB (KKx), 2019 U.S. Dist. LEXIS 153367 *1, *41 (C.D. Cal. March 4, 2019) ("[T]he Court finds that Plaintiffs' security checkpoint subclass and Plaintiffs' overtime subclass to the extent it is based on the security checkpoint claim cannot be maintained because Plaintiffs are unable to put forth a workable damages model."). As such, if Plaintiffs' unpaid wages claim is certified, there is a risk that this class may later be decertified. Mara Decl. ¶ 36.

### iii. Risks on the Merits
#### 1. Plaintiffs' Claims for Unpaid Straight/Overtime Wages and Meal and Rest Periods Hinge on Whether Burlington Security Screenings Constitute a Sufficient Employer Control

Plaintiffs' claims for unpaid straight and overtime wages and meal and rest period violations are based on the same set of facts, *i.e.*, Burlington's security screenings employees have to satisfy upon entry and exit. Plaintiffs claim that, because of these searches, Plaintiffs are not relieved of all control for meal and rest breaks and, due to the fact that Class Members endure these screenings while they are off the clock, they are not paid straight and overtime wages while undergoing the screenings. Mara Decl. ¶ 37.

Based on the security screenings, Plaintiffs claim that their right to 30-minute meal and 10-minute rest periods, wherein employees are to be free to leave the premises

without being subject to employer controls, have been violated. *See Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1038-1040 (2012); *accord Augustus v. ABM Security Services, Inc.*, 2 Cal. 5th 257, 260, 265 (2017). Because these screenings subject them to control off the clock, *i.e.*, when they are not being paid, Plaintiffs also claim that their right to be compensated for all hours subject to the employer's control has been violated. Mara Decl. ¶ 38.

Recently, the California Supreme Court, in *Frlekin v. Apple, Inc.* 8 Cal.5th 1038 (2020), issued a decision on whether security searches could constitute an unlawful control in the unpaid wage context. Although the Court found that the searches in question did rise to the level of compensable control under the Wage Order and previous precedent, the Court cautioned that whether a given search is compensable is determined on a case-by-case basis through a variety of factors assessing the "degree of the employer's control:"

> We also emphasize that whether an activity is required remains probative in determining whether an employee is subject to the employer's control. But, at least with regard to cases involving *onsite* employer-controlled activities, the mandatory nature of an activity is not the only factor to consider. We conclude that courts may and should consider additional relevant factors— including, but not limited to, the location of the activity, the degree of the employer's control, whether the activity primarily benefits the employee or employer, and whether the activity is enforced through disciplinary measures—when evaluating such employer-controlled conduct.

*Frlekin*, 8 Cal.5th at 1056 (emphasis in original).

There was a considerable dispute over the degree of employer control the searches at issue here occasioned on Class Members. Burlington contends that its entry/exit screenings are minimal, with most employees not even breaking stride upon entering and exiting the facility. Burlington searches bags upon entry to ensure employees are not bringing anything dangerous, *i.e.*, a weapon, into the warehouse. Burlington urges employees to either not bring in bags or bring all belongings in a clear plastic bag for quick, unhindered passage at checkpoint. The exit searches, although for a different, inventory control related purpose, bear the same hallmark according to Burlington. That is, if no bag is brought out, or, if the employee does tote a bag of some sort, if it is contained in a clear plastic bag, the employee is not delayed in leaving the facility.

Burlington contrasts its searches from those of the tech retail giant in *Apple,* wherein the record showed employees were detained under the policy for up to several minutes while a manager was flagged down to perform a search. Burlington employees do not have to endure such wait times to comply with the policy, as there is a designated security gate through which they pass. Thus, based on these facts, Burlington contends that, on balance of the factors outlined in *Apple*, its searches do not constitute an unlawful control for purposes of assessing wage and meal/rest period violations. Mara Decl. ¶ 39.

Given the load-bearing nature of the status of the security screenings here on the predominating claims for unpaid straight/overtime wages and meal and rest period violations, Plaintiffs had to seriously evaluate the risk of Burlington prevailing on the issue in engaging in settlement discussions. Mara Decl. ¶ 40.

In evaluating the risks, Plaintiffs did so on a sliding scale. Whether a search rises to the level of a compensable control during which employees must be paid does not fall under the same analysis when analyzed in the context of meal and rest period claims. Meal and rest periods enjoy a more heightened freedom from employer mandated controls and intrusions than they do for purposes of evaluating the same in the unpaid wage context. Whereas for purposes of evaluating whether an employer policy – like the security screenings at issue here – rises to a compensable control focuses on "the degree of the employer's control," Plaintiffs contend *any* employer control exerted during a meal and/or rest period triggers meal and rest period liability for which an hours' worth of pay is owed under Labor Code § 226.7. Mara Decl. ¶ 41.

In *Brinker* and *Augustus,* the California Supreme Court ruled that, "[d]uring rest [and] meal periods, employers must relieve their employees of all duties and *relinquish any control* over how employees spend their break time." *Augustus,* 2 Cal.5th at 260; *see also Brinker Restaurant Corp.*, 53 Cal.4th at 1038-1039 (emphasis added). In *Augustus* and the recently decided *Troester v. Starbucks Corp.*, 5 Cal.5th 829 (2019), the California Supreme Court expressly pointed out that *any* intrusion during meal and rest periods cannot be squared with the Wage Orders' protective purposes and confirmed that the analysis of what constitutes compensable control in the unpaid wage context is

more onerous than for meal and rest periods. *See Augustus,* 2 Cal.5th at 271, FN 13 (multi-factored analysis for assessing compensability of on-call time is "inapposite in the context of a rest or a meal period."); *see also Troester*, 5 Cal.5th at 844-845 (reasoning that "the strict construction of a law prohibiting *any interference* with or reduction of a 10-minute rest break is difficult to reconcile with a rule that would regard a few minutes of compensable time per day as a trifle not requiring compensation if too inconvenient to record."). Based on the different legal impact the searches have on meal and rest period claims as opposed to wage claims, Plaintiffs placed a greater risk factor on the straight and overtime wage claims than the claims for meal and rest period violations when evaluating settlement.[12]

### a.  Wage Statement and Waiting Time Penalties Claims

Plaintiffs also pursued claims for failure to provide accurate itemized wage statements and waiting time penalty claims. These claims are derivative of Plaintiffs' unpaid wages claims. Should Plaintiffs' unpaid wages claims fail, these claims would also fail. Burlington argues that it would not be liable for waiting time penalties because a "good faith dispute" exists over the payment of past wages. *See* Cal. Code Regs. Tit. 8 § 13520; *Amaral v. Cintas Corp.*, 163 Cal.App.4th 1157, 1201 (2008). Further, Burlington contends Plaintiffs would have to prove it "willfully" failed to pay class members appropriate wages due upon separation of employment, which Burlington contends was not willful, as it was not adjudged to be the workers' employer at the time of separation. *See* Cal. Lab. Code § 203(a). Mara Decl. ¶ 43

### b.  PAGA Claims

Plaintiffs' PAGA claims are based on the same alleged unlawful conduct as their class claims. Therefore, PAGA penalties could only be awarded if the factfinder agreed with Plaintiffs' theories of liability. Should the Court agree with any of Burlington's

---

[12] Burlington disputes Plaintiffs' interpretation of California law. Specifically, Burlington contends that whether the security screenings rise to the level of unlawful control is the same analysis for wage claims as it is for meal and rest period claims. At any rate, the dispute about the legal test of what constitutes a violation is exemplary of another threshold issue that could have significant bearing on the outcome of the case if litigation continued. Mara Decl. ¶ 42.

defenses to certification or on the merits, the potential exposure for PAGA would be reduced and any associated PAGA penalties would be extinguished, as penalties can only be awarded if the Court agrees with Plaintiffs' underlying allegations. Further, these penalties would be in addition to the potential recovery from the underlying violations. Mara Decl. ¶ 44.

Section 2699, subdivision (e)(2) provides that "[i]n any action by an aggrieved employee seeking recovery of a civil penalty available under subdivision (a) or (f), a court may award a lesser amount than the maximum penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary, oppressive, or confiscatory." In *Thurman v. Bayshore Transit Management, Inc.*,[13] the court determined that an award of the maximum penalty allowed may be unjust in circumstances outside of when a defendant cannot afford to pay the maximum amount. *Thurman v. Bayshore Transit Management, Inc.*, 203 Cal. App. 4th 1112, 1135-1136 (2012). The *Thurman* court found that penalties may be reduced when a defendant has taken its obligations to comply with the law seriously. *Id.* Burlington argues that if the case were to continue in litigation, it would be able to show that it took its obligations to comply with the law seriously such as providing an additional 15 minutes during meal periods and 5 minutes during rest breaks. As such, if Plaintiffs were able to prevail on the merits of their PAGA claims, it is likely that the Court would reduce the maximum penalty allowed. Mara Decl. ¶ 45.

As the above explains, Plaintiffs had to significantly factor in the risks of prevailing on their claims, all of which are based on whether the entry/exit searches constituted unlawful controls in the context of the particular claims at issue. Plaintiffs also had to seriously factor in the risk of losing on the issue of whether Burlington is the employer under the *Borello* factors. The settlement amount of $3,000,000 is a reasonable compromise of those claims and their respective risks as outlined above. Again, without the settlement, the Parties would be required to litigate the merits of the case—a process

---

[13] 203 Cal. App. 4th 1112 (2012).

which is long, complex, uncertain, and expensive. Burlington would conduct further motion practice to defend against Plaintiffs' claims such as seek summary judgment on the employment relationship issue and oppose any motion for class certification. Settlement of this matter will conserve the resources of this Court and the Parties, thus weighing in favor of final approval. Mara Decl. ¶ 46.

### D. Thorough Investigation and Discovery Has Occurred

Throughout the course of litigation, the Parties engaged in concentrated informal discovery. Although informal in the sense that documents, data, and information were produced pursuant to informal requests instead of formal discovery inquiries, the gathering of information was no less robust than Plaintiffs would obtain through formal means. Mara Decl. ¶ 47.

The discovery conducted and the resultant meet and confer efforts led to exchanging hundreds of pages of documents and hundreds of thousands of lines of data. The information and data included, for example, policies and best practices, meal period and rest break policies, contracts between Burlington and Lyneer Staffing Solutions, Lyneer Staffing Solutions' time records, attendance records, and pay records, as well as personnel files. Plaintiffs hired an expert, Mr. Jarrett Gorlick, who analyzed the timekeeping and payroll data. Mara Decl. ¶ 48.  At the point the settlement was initially agreed to, no one was in a better position than Plaintiffs' Counsel to understand the strengths and potential limitations of Plaintiffs' case and thus evaluate the reasonableness of the amount offered in settlement.

### E. Class Counsel Have Extensive Experience Acting as Class Counsel

As set forth in Plaintiffs' Motion for Attorneys' Fees, Costs, and Class Representative Enhancement Payment, Class Counsel's experience in complex class action matters is extensive. *See also* Mara Decl. ¶ 2-20. Indeed, Mr. Mara from the Mara Law Firm, PC was class counsel in *Hohnbaum et al. v. Brinker Restaurant Corp et al.,* which is the subject case in the landmark decision of *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004. *Id.* at ¶ 14. Class Counsel have prosecuted numerous cases on behalf of employees for California Labor Code violations and thus are experienced and qualified to evaluate the class claims present in this case, and the

defenses thereto, and to evaluate settlement versus trial on a fully informed basis. This experience instructed Class Counsel on the risks and uncertainties of further litigation and guided their determination to endorse the proposed settlement.

### F. The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable

The Ninth Circuit has held that the number of class members who object to a proposed settlement is a factor to be considered in determining a settlement's fairness. *Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832, 837 (9th Cir. 1976). Here, not a single Class Member has objected to the settlement or requested to be excluded from the settlement, resulting in a 100% participation rate in the settlement. The lack of objections and requests for exclusion evidences the Class Members' endorsement of this non-reversionary settlement.

### G. The Court Should Approve the Settlement Administration Fee

The Parties agreed to hire CPT as the Settlement Administrator, a choice the Court approved in conjunction with granting preliminary approval. CPT was responsible for mailing the Class Notice to Class Members, obtaining updated addresses for undeliverable Class Notices, responding to Class Member inquiries, providing weekly status reports to all counsel, receiving communications from the Class Members, maintaining a settlement website, and providing a declaration documenting its duties and responsibilities in administering the Class Notice. Following the grant of final approval, CPT will continue to calculate the payments to Participating Class Members and PAGA Group Members, send the individual Settlement Shares to Participating Class Members and PAGA Payments to PAGA Group Members, distribute other payments ordered by the Court, and perform such other duties as described in the Joint Stipulation. CPT's fee of $45,000 for services rendered and to be rendered is fair and reasonable and should be granted. *See also* Mara Decl. ¶ 51.

### H. The Court Should Approve the PAGA Payment to the LWDA

The payment of $225,000 (75% of $300,000) to the LWDA for its share of the applicable penalties claimed under PAGA is reasonable under the circumstances. The

Parties negotiated a good faith amount to the LWDA. The sum to be paid to the LWDA was not the result of self-interest at the expense of other Class Members. The LWDA was provided notice of the settlement and the instant motion. Plaintiffs did not receive a response or objection to the settlement from the LWDA. *See* Mara Decl. ¶ 52. Thus, Plaintiffs respectfully request final approval of the sum of $225,000 for payment to the LWDA and the remain $75,000 to PAGA Group Members.

## VI.    CLASS ACTION FAIRNESS ACT NOTICE

This action was removed pursuant to the Class Action Fairness Act of 2005 (CAFA), codified in part at 28 U.S.C. § 1332(d). Pursuant to 28 U.S.C. § 1715, Burlington was required to give notice of the proposed settlement to the appropriate State official of each State in which a class member resides and the appropriate Federal office within ten (10) days after the proposed settlement is filed in court. 28 U.S.C. § 1715(b). Burlington has given such notice. *See* Declaration of Ryan C. Bykerk Re: Defendant's Notice to United States Attorney General and State Attorneys General of Proposed Class Action Settlement Pursuant to 28 U.S.C. § 1715(b).

## VII.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court find the settlement is fair, reasonable, and adequate and grant final approval of the settlement. Plaintiffs further request the Court approve the requested settlement administration fee and PAGA payment. Finally, Plaintiffs respectfully request the Court enter final judgment in this matter.

Dated: February 1, 2021                    **MARA LAW FIRM, PC**


                                           /s/ *David Mara*
                                           David Mara, Esq.
                                           Tony Roberts, Esq.
                                           Attorneys for Plaintiffs